[Cite as *Al-Jahmi v. Ohio Athletic Comm.*, 2022-Ohio-2296.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Ali Al-Jahmi [Personal Representative]      :
of the Estate of Hamzah Al-Jahmi,
                                            :
        Plaintiff-Appellant,
                                            :
                                                            No. 20AP-321
v.                                          :               (Ct. of Cl. No. 2017-00986JD)

Ohio Athletic Commission,                   :               (REGULAR CALENDAR)

        Defendant-Appellee.                 :

                                            :

---

D E C I S I O N

Rendered on June 30, 2022

---

**On brief:** *McKeen & Associates, P.C.,* and *Todd C. Schroeder*, for appellant. **Argued:** *Todd C. Schroeder*.

**On brief:** *Dave Yost*, Attorney General, *Daniel R. Forsythe,* and *Howard H. Harcha, IV*, for appellee. **Argued:** *Daniel R. Forsythe*.

---

APPEAL from the Court of Claims of Ohio

DORRIAN, J.

{¶ 1} Plaintiff-appellant, Ali Al-Jahmi, Personal Representative of the Estate of Hamzah Al-Jahmi, appeals the May 13, 2020 judgment of the Court of Claims of Ohio granting summary judgment in favor of defendant-appellee, Ohio Athletic Commission ("OAC"). The May 13, 2020 judgment made final and appealable the Court of Claims' (1) September 4, 2018 decision and entry granting in part and denying in part OAC's motion for summary judgment, and (2) May 13, 2020 judgment denying appellant's motion for reconsideration and motion for summary judgment and granting OAC's motion for summary judgment. Appellant appeals both decisions. For the following reasons, we

affirm the Court of Claims' September 4, 2018 decision and entry, and affirm in part and reverse in part the court's May 13, 2020 judgment.

## I. Facts and Procedural History

{¶ 2}   This matter arises out of a professional boxing match billed as "Season's Beatings" that took place the night of December 19, 2015 at Saints Peter and Paul Ukranian Hall in Youngstown, Ohio (the "bout" or "fight").   Nineteen-year-old Hamzah Al-Jahmi ("Hamzah") was one of the boxers that evening.   Hamzah had trained as a boxer since he was 12 years old, training 2 hours a night, 5 days a week.   Although Hamzah fought in a number of amateur events, this was his first bout as a professional boxer.

{¶ 3}   Hamzah's trainer, Mohamed Hamood, had been training Hamzah since 2011 and Hamzah competed in seven or eight amateur bouts with Hamood.   Prior to training with Hamood, Hamzah had boxed as an amateur in other bouts.   On the night of the fight, Hamood was in Hamzah's corner for the entire fight.   The fight that evening consisted of four, three-minute rounds, with one-minute rest between each round.

{¶ 4}   During the first round, Hamzah was hit on the right side of his chin with a left hook and was knocked down.   According to Hamood, "[h]e got caught with a -- I think it was a left hook.   Went down.   Got right back up [and he] was good when he got back up." (Hamood Depo. at 42.) This first knockdown was characterized by Hamood as a "flash knockdown," knockdowns that stun a boxer, however the boxer is able to get up and is fine. (Hamood Depo. at 97.)

{¶ 5}   Following the first knockdown, Hamzah was knocked down again; however, he got up and was fixing his shorts while the referee counted.   Hamood did not recall anything abnormal in the first round.   When asked if Hamzah appeared wobbly during the first round, Hamood responded "I think when he stood up once, he stepped to the side once, but that's like normal when you get knocked down."   (Hamood Depo. at 42-43.)   The step was described by Hamood as a "stutter step," an immediate stagger to the right followed by the regaining of composure.   (Hamood Depo. at 96.)   At the end of the first round, Hamzah was pushed down to the ground.

{¶ 6}   Hamzah defended himself and landed punches in the first round.   Hamood expressed concern generally that "[w]e all get concerned when our fighter gets knocked down, you know." (Hamood Depo. at 45.) Hamood stated that for a second he contemplated

ending the fight in the first round, however, after assessing Hamzah between rounds one and two, Hamood observed that Hamzah made eye contact and coherently communicated with Hamood. Hamood explained further by describing the interaction he had with Hamzah between the first and second rounds:

> He came back to the corner and I -- I put the seat in. I jumped in the ropes. He said: What I do wrong, Coach? And he sat down. He was upset. I said: Okay. You got caught. Your right hand wasn't up. You got to keep your right hand up and you got to move your feet laterally, side to side, don't just back straight up. He said: Okay, Coach. And I was talking to him just like I'm talking to you now and he was talking right back to me. He said: Okay, Coach.

(Hamood Depo. at 44.) Hamood did not have concern that the safety or well-being of Hamzah was in jeopardy after the first round and further would have complained if the referee would have called the fight after the first round.

{¶ 7} Hamzah went on to win rounds two and three. In the second round, Hamzah was moving and punching well and incorporating Hamood's coaching into the round. In the third round, Hamzah continued landing punches and defending himself and Hamood felt "[Hamzah] let his hands go a little bit better." (Hamood Depo. at 49.) Hamzah's father, appellant, also testified Hamzah was landing punches and able to defend himself in the second and third rounds.

{¶ 8} Between the third and fourth rounds, Hamzah stood up ten seconds early and looked over at his father and raised his hand to him. Hamood indicated to Hamzah he had time to sit, but Hamzah responded that he was ready. Hamzah stood up early for the fourth round and according to Hamood, "[a]gain, he was doing a fantastic job. Doing a great job. He was boxing, boxing, and at the end of the round is when he went down. I -- he never really got hit when he went down." (Hamood Depo. at 51.) According to Hamood, Hamzah complained that he twisted his knee and that he could not get up. Hamood waved for the doctor and the doctor came into the ring and told Hamzah to lay back. Hamzah laid back and went unresponsive. Hamzah left in the care of the EMTs who were present at the fight and was transported to St. Elizabeth Hospital with a Glasgow Coma Scale of 3 upon arrival. Hamzah underwent trauma workup, including CT imaging of his brain, and then into emergency surgery.

{¶ 9}   Hamzah lost the fourth round, however one judge scored Hamzah as the fourth round winner.  According to Hamood, after the first round Hamzah went on to win the second, third, and fourth rounds of the fight.

{¶ 10} Mohammed Yacoubi, a friend of Hamzah, described the two as brothers. Yacoubi was present for the fight and sat 15 to 20 yards from the ring, on the side closest to Hamzah.  After the second knockdown in the first round, Yacoubi "knew something was up." (Yacoubi Depo. at 18.)  Yacoubi felt that the fight should have been over.  Yacoubi observed that Hamzah "didn't look like he was -- kind of had looked like he had spaghetti legs for a second.  Like, you know, he was kind of wobbling." (Yacoubi Depo. at 19.) Yacoubi observed Hamzah having a wobble in all four rounds of the fight and Hamzah appeared fatigued.

{¶ 11} Stephanie Schiavone was assigned by her employer at the time as an advanced EMT to be on standby at Hamzah's fight.  During the bout, Schiavone was seated right in front of the ring with her EMT partner, Danielle Horton, and the ringside physician, Dr. James Armile.  Schiavone explained in her deposition that she typed notes into her iPhone through the "notes" app, contemporaneous with her observations during the fight, time-stamping her notes that she would later input into a separate application, EMS charts, to enter her notes into the EMS run sheet.  Schiavone's notes are reflected in the EMS run sheet and can be identified as hers by the notation of "Crew No. 3" or her notes are written in all capital letters.

{¶ 12} Schiavone provided a description of the bout, "EMS ONSCENE AT UCRAINE [sic] ORTHODOX CHURCH FOR SEASONS BEATINGS BOXING MATCH IN FRONT OF THE RING IN A OVER CROWED [sic] PAST MAX CAPACITY."[1] (Schiavone Depo., Ex. A at 1.)

{¶ 13} Schiavone became concerned that Hamzah may need emergency services during the bout and found it necessary to contact an ambulance in case Hamzah would need emergency transport. Schiavone's notes reflect, "EMS ONSCENE ALERTED DISPATCH FOR NEED OF ALS TRANSPORTING UNIT WHEN PT. INITIALLY COLLAPSED TO THE GROUND."  (Schiavone Depo., Ex. A at 1.) Schiavone testified

---

[1] A note time-stamped 22:15 states: "Due to the unsafe environment and crowd surrounding EMS, pt. was rapidly removed from the area and taken to ambulance." (Schiavone Depo., Ex. A at 4.)

dispatch is notified in order to advise what is going on and request assistance "because of the potential - - like in EMS words, when you have a gut feeling that something bad is going to happen, it usually does." (Schiavone Depo. at 40.)

{¶ 14} According to the run sheet, Schiavone provided the following as to "History of Present Illness:"

> EMS WAS ONSCENE AT THE ukraine ORTHODOX BOXING MATCH FOR STAND BY. PT WAS BEAT HARD[2] IN THE FIRST 3-5 MINUTES AND DROPPED TO THE GROUND. PT GOT UP AND FELL DOWN AGAIN BEING BEAT UP BY HIS OPPONENT. PATIENT WAS ADVISED BY REF TO WALK TOWARD HIM THEN PATIENT RETURNED TO MATCH. PT. CONT. TO FIGHT THE NEXT TWO ROUNDS OF THE BOUT, WINNING BOTH ROUNDS. AFTER THE THIRD ROUND[3] THE BOXER'S KNEES BUCKLED, HE WENT TO THE GROUND. HE INITIALLY C/O KNEE PAIN, THEN WENT UNRESPONSIVE IN THE RING.

(Schiavone Depo., Ex. A at 2.) Schiavone clarified her note in her deposition stating Hamzah did walk toward the referee, Wilfredo Osorio.

{¶ 15} According to a notation time-stamped 22:05,[4] Schiavone wrote:

> PT SUSTAINED A MASSIVE AMOUNT OF HITS TO THE HEAD FOR THE FIRST THREE MINUTE ROUND OF THE FIGHT. PT WAS KNOCKED TO THE GROUND MULTIPLE TIMES DURING THE ROUND DUE TO THE POWER OF THE HITS. PT WAS UNSTEADY AFTER COMING TO HIS FEET. PATIENT WAS ADVISED BY REF TO WALK TOWARD HIM, BUT THE PT WASN'T LOOKING AT THE REF HE WAS LOOKING AT HIS OPPONENT THE WHOLE TIME. THE REF FAILED TO CHECK THE BOXER'S PUPILS BEFORE THE MATCH RESUMED. THE PT WALKED FORWARD AND THE MATCH RESUMED WITHIN SECONDS.

(Schiavone Depo., Ex. A at 3.) When asked what she meant in her note that the patient was unsteady on his feet, Schiavone testified: "Like he's -- kind of like when you're half asleep

---

[2] When asked what she meant by "beat hard," Schiavone responded, "[h]e got his ass kicked. * * * Basically [the other fighter] was just better, had better fast shots. It just seemed like [Hamzah] never was able to block himself, you know." (Schiavone Depo. at 82-83.)

[3] Schiavone clarified in her deposition this was probably in the fourth round.
[4] According to the run sheet, EMS's first notation was made at 19:25, stating the unit was currently on scene for standby at the Season's Beating boxing bout.

trying to get up and you can't figure out how to stand up. * * * [T]hat happened a couple of times in each of the rounds. * * * And it was worse on each round." (Schiavone Depo. at 93.) Schiavone further described Hamzah's unsteadiness as "kind of like sleep -- kind of like sleep dazed, like confused." (Schiavone Depo. at 127.) During rounds two and three, Schiavone believed Hamzah had suffered an injury that he was fighting through and further that he was essentially asleep on his feet.

{¶ 16} Schiavone also clarified her notes regarding Osorio's failure to check Hamzah's pupils, testifying as to the evening of the bout, "[e]very single fight that was there, all the prior coaches, all the prior refs, all the prior doctors all check the pupils. * * * If they fell to their feet and they thought there was a stumble or something going on, that's when they have them [check the boxer's pupils]." (Schiavone Depo. at 94-95.) Schiavone testified she knew that Osorio did not check Hamzah's pupils because Osorio did not have a pen flashlight in his hand and Osorio did not look in Hamzah's eyes. Schiavone explained a light must be shone in the eye in order to determine if there is a reaction.

{¶ 17} Schiavone testified that after she made her notes at 22:05, she communicated with Dr. James Armile that she was concerned about Hamzah and believed Hamzah should be assessed by him. Specifically, Schiavone testified she asked Dr. Armile to check Hamzah's eyes. In her deposition testimony, Schiavone thought she recalled Dr. Armile going up to the ring to Hamzah between a round to look at Hamzah, but she could not remember at what point in the fight this happened. Schiavone expressed her discontent with Dr. Armile to Scott Meyer, a third EMS who assisted with Hamzah once he was loaded in the ambulance. When questioned why she did not take more of an affirmative action, Schiavone testified she was instructed to only step in when the ring-side physician permits EMS to do so.

{¶ 18} At 22:06, Schiavone noted, "EMS NOTIFIED DISPATCH THAT 19 YEAR OLD MALE MAY NEED TRANSPORT PRIOR TO PATIENT LAST FALL IN THE BOXING RING. CAS UNIT 400 DISPATCHED TO CAS UNIT 500 AS BACK UP." (Schiavone Depo., Ex. A at 3.) Schiavone clarified the last fall in this note referred to the first round.

{¶ 19} A second EMT present with Schiavone was Danielle Horton. Horton testified she became concerned Hamzah would need emergency services in the first round of the bout because "[h]e took several hard blows to the head. He fell down, that [sic] when he

would get back up, he kind of seemed very uneasy on his feet, unsteady on his feet." (Horton Depo. at 19.)   Horton advised Schiavone about her concern and believed Schiavone contacted Dr. Armile.   Horton testified that in the second and third rounds, Hamzah appeared "discombobulated, if that's the right word.  He seemed very uneasy on his feet, but he was still landing punches.  But he just didn't seem to be all there." (Horton Depo. at 22.)  Horton agreed Hamzah was also able to defend himself.

{¶ 20} Tragically, Hamzah died as a result of injuries sustained from blows to his head during the match.  Dr. Kene Ugokwe was the neurosurgeon on call on the night of the fight.  After observing a large frontal temporal subdural hematoma on Hamzah's CT scan, Dr. Ugokwe took Hamzah into emergency surgery.  During surgery, Dr. Ugokwe evacuated the subdural hematoma and noted that Hamzah's brain was "still very swollen and tight." (Dr. Ugokwe Depo. at 26.)  Dr. Ugokwe opined Hamzah's cause of death was "[s]evere traumatic intercranial traumatic brain injury with subdural hematoma" and that Hamzah suffered from a concussion.  (Dr. Ugokwe Depo. at 29.)

{¶ 21} During his deposition, Dr. Ugokwe was questioned regarding his position as to statements made by Dr. Joseph Ohr, Mahoning County's deputy coroner, in a Youngstown, Ohio newspaper article entitled, "Boxer died of bleeding on [the] brain." (Dr. Ugokwe Depo. at 31-32, Ex. B.)  Dr. Ugokwe agreed with the following statements made by Dr. Ohr in the article:

> It seems reasonably clear that he died from head injuries from the boxing match * * *. There was no other reason for him to be dead. * * * The dura is the membrane covering the brain, which supports the blood vessels that drain the brain's surface * * *.  A punch quickly rotates the skull, stressing and tearing the tiny blood vessels and causing bleeding * * * [b]ecause there's a space between the dura and the brain, bleeding can occur that really causes no symptoms of injury * * *. Suddenly, there's enough bleeding that causes pressure on the brain, and it's that pressure that causes the person to collapse and, ultimately, to die * * *.

(Dr. Ugokwe Depo. at 31-32, Ex. B.)  Dr. Ugokwe also testified the clinical signs of a concussion appear on a wide spectrum; including headaches to altered mental status and further agreed wobbly legs or knees, being woozy or dizzy or unable to focus eyes could also be signs of a concussion. However, according to Dr. Ugokwe, diagnosis of a concussion

necessitates clinical evaluation of a patient and either radiographic or pathological diagnosis. Based on Hamzah's ability to continue to fight after the first round, Dr. Ugokwe gave his opinion that had Hamzah been assessed and found to have a concussion after the first round and brought to the hospital, Hamzah's prognosis would have improved.

{¶ 22} During his deposition, Dr. Ugokwe was asked whether he agreed with a number of statements regarding a referee's knowledge of concussions. Dr. Ugokwe agreed he would expect a referee to know concussions happen in boxing. Dr. Ugokwe also agreed that if a referee does not know that concussions happen in boxing, the referee is not in a position to make assessments or observations whether or not a fight should be stopped for an evaluation. Lastly, Dr. Ugokwe agreed if a boxing referee is not in a position to evaluate a boxer, then the risk of head injury to the boxer is increased above and beyond that which is inherent in the sport of boxing.

{¶ 23} The OAC is the state agency which regulates the sport of boxing in Ohio. The OAC licenses prospective referees and determines which referee will officiate a particular bout. The OAC assigned Wilfredo Osorio to serve as the referee for the professional boxing bout held on December 19, 2015.[5] Osorio had acted as a referee in the state of Ohio for amateur boxing fights since 2009, and for professional fights since approximately 2014. In order to obtain his professional referee license in Ohio, Osorio met with Randy Jarvis, a boxing referee with experience one-on-one and learned how to walk around the ring with professional boxers. Osorio could not recall if he met with Jarvis on more than one occasion. Once Osorio met with Jarvis, in order to complete the registration process for a license in Ohio, Osorio mailed in his application with the fee.

{¶ 24} As the referee, Osorio described his job is to ensure the boxers are safe and the rules are followed. After the end of a round, Osorio testified he has a habit of looking at the boxer, checking to see if the boxer is hurt, and watching the interaction between boxer and coach checking for responsiveness from the boxer and further to ensure all is correct in the corner. Osorio affirmed he would have performed this habit during the fight that night.

---

[5] The OAC affirmed that Osorio was an agent or employee of the OAC at the December 19, 2015 bout, and that his acts or omissions fell within the scope of his employment duties. The OAC also affirmed that Dr. Armile and Bernie Profato were agents or employees of the OAC at the bout on December 19, 2015.

{¶ 25} Osorio testified he has not received any training or education regarding brain injury in boxing nor has he ever self-studied mechanisms of brain injury in boxing. Osorio testified in his deposition that he uses his own individual judgment from his personal experience to determine whether a boxer is able to fight and that determination is made by his assessment of the following: body language, eyesight, wobbly legs, and inability to focus. Osorio claimed general knowledge of concussions, but did not know what a concussion is, how a concussion may arise or to what part of the body it can occur. Osorio responded that he did not know a boxer can receive a brain injury during the course of a bout. According to Osorio, there is no standard criteria in the state of Ohio for a referee to determine if a fighter has sustained a concussion.

{¶ 26} Osorio testified Hamzah's legs were not wobbly after the first and second knockdowns in the first round and further did not agree Hamzah was unsteady after coming to his feet. Osorio stated in his affidavit: "On December 19, 2015, I observed * * * Hamzah * * * during the professional fight. [Hamzah] did not show any signs of an injury until after the end of the fourth round and bout, when he went down to the mat and lost consciousness. Had I observed any signs during the bout, I would have called the bout." (Deft.'s Second Mot. for Summ. Jgmt., Osorio Aff. at ¶ 6.)

{¶ 27} Dr. Armile acted as ringside physician for the four boxing bouts held at Saints Peter and Paul Ukranian Hall on December 19, 2015. Dr. Armile has been licensed by the State of Ohio Medical Board as a Doctor of Osteopathic Medicine since 1997, and since 2002 has practiced as a dermatologist. Dr. Armile acted as a ringside physician in Ohio for both amateur and professional boxing bouts for approximately three to four years ending in 2015. Dr. Armile has served as a Commissioner for the OAC since 2013. Dr. Armile learned about concussive symptoms while he was in medical school and also learned about concussion and brain injuries through self-study.

{¶ 28} Dr. Armile testified he considers his duty as ringside physician to monitor the fighters by conducting a pre-fight physical, by watching the fight, and the post-fight exam. Dr. Armile explained he monitors the fight by watching the fighter's actions, looking for signs of injury of any type, including injury for which he may want to intervene. Dr. Armile testified he believes he has the authority to recommend to the referee that the referee stop the bout; however, he has never made that recommendation before. Dr. Armile also

testified he has gone to a boxer's corner after the boxer sustained a number of blows to the head to confirm the boxer could continue; however, Dr. Armile did not do that with Hamzah. In looking for whether a boxer may have suffered concussive impact or other brain injury, Dr. Armile testified he looks for the boxer to be unsteady on their feet, whether the boxer appears to know where they are or if the boxer is unable to walk at an angle toward the referee. If Dr. Armile observed either one of those signs, he stated he would have intervened.

{¶ 29} Dr. Armile testified he entered the ring for the first time when Hamzah went down at the end of the fourth round of the bout. Dr. Armile provided in an affidavit filed with the OAC's second motion for summary judgment filed October 11, 2019, "[d]uring [Hamzah's] boxing bout on December 19, 2015, at which I acted as ringside physician, I did not request that the bout be stopped, because Hamzah [] did not show any signs of concussive impact or brain injury until after the end of the fourth round and bout, when he went down to the mat and lost consciousness." (Deft.'s Second Mot. for Summ. Jgmt., Dr. Armile Aff. at ¶ 8.) In his deposition, Dr. Armile testified neither of the EMTs communicated concern regarding Hamzah nor did either EMT recommend the doctor intervene to assess Hamzah. Dr. Armile disagreed with the EMTs' assessment that Hamzah was wobbly after the first two knockdowns. Dr. Armile further contested the run sheet, testifying the patient looked at the referee and clarified the patient is made to walk at an angle after they are knocked out, not so much forward.

{¶ 30} In his deposition, Dr. Armile agreed the referee is the only person authorized by the Ohio Administrative Code to stop a boxing bout. Dr. Armile also agreed the referee must have an appropriate base of knowledge in order to be able to assess whether a boxer has sustained a concussive impact or other brain injury in order to determine whether a bout should be stopped. Lastly, Dr. Armile agreed that a referee who lacks an appropriate base of knowledge to identify concussions or brain injuries in boxing would fall below the standard of care a referee owes a boxer.

{¶ 31} Bernie Profato has served as the executive director for the OAC since 2004 and was present as the fight inspector for the boxing bout held at Saints Peter and Paul Ukranian Hall on December 19, 2015. According to Profato, he has been involved in the boxing profession for nearly his entire life; 5 years fighting as an amateur boxer and serving

as a professional boxing referee for nearly 20 years.  By affidavit, Profato described signs he looks for in determining whether a boxer has suffered a head-related injury, and further, that he did not observe any of those signs from Hamzah and if he had, he would have called the fight.

{¶ 32}  Profato explained that the licensing process for boxing referees in Ohio has three steps; shadowing at sanctioned bouts with an experienced referee, recommendation on successful shadowing, and then an application submitted for approval by the OAC Board.  In further detail, Profato explained the interested potential referee will contact the OAC requesting to shadow at a bout.  Profato explained, "[t]he process is they go there and just observe for two to three fights.  And then we have them at one of the bouts, then, work one, maybe two of the bouts, and they're evaluated.  That's their final test.  And they're evaluated on that.  And if they pass that, because they've got that far, then they're issued a license." (Profato Depo. at 27.)  Thereafter, on approval, an application is completed by the interested individual with fees paid and the OAC will need to approve the application.  Profato denied that working one-on-one with a veteran referee in a gym would qualify under the shadowing process.

{¶ 33}  Profato agreed that if a referee or ringside physician was ignorant of the fact that a boxer could receive a brain injury, that would put the boxer in an unsafe situation and also enhance the risk to the boxer. Profato also agreed that if a referee lacks an appropriate understanding of brain injuries or concussive impacts in boxing, then the referee would not be in a position to determine whether or not a ringside physician should be called in.  Profato stated he does not have confirmation when licensing a referee that the individual has satisfactory awareness of brain injuries and concussive impacts in boxing and relies on the trial period shadowing veteran boxers and observation of the individual.  Profato agreed it is assumed that the licensed referee has been made sufficiently aware that there are brain injuries in boxing and the OAC does not actively affirm this assumption.  Profato further agreed that if he concluded Osorio lacked the appropriate foundation of brain injuries in boxing he would not have allowed Osorio to be a referee at the bout.  Profato then admitted he did not know Osorio's foundation of knowledge regarding brain injuries in boxing.

{¶ 34} Appellant, as the personal representative of Hamzah's estate, filed a complaint on December 18, 2017 against the OAC requesting an award of damages in the amount of $25 million. The OAC filed an answer and counterclaim on February 13, 2018 asserting 15 affirmative defenses, ultimately requesting dismissal of appellant's complaint and further counterclaiming to exercise the OAC's rights pursuant to the indemnification clause in the bout contract signed by Hamzah, in which Hamzah agreed to release, indemnify, and hold harmless the OAC against any claims, suits, and actions resulting from the bout described in appellant's complaint.[6] The OAC's counterclaim requested declaratory judgment and compensatory damages. On February 16, 2018, appellant filed a response to the OAC's affirmative defenses denying paragraphs 1 through 9 that was later amended on February 27, 2018 to deny paragraphs 5 through 19. Appellant filed an amended complaint and answer to the OAC's counterclaim on February 27, 2018.[7]

---

[6] The OAC filed an answer and renewed counterclaim on March 13, 2018.

[7] Appellant alleged in the amended complaint that the agents and/or employees of the OAC were negligent and/or reckless by failing to do the following:

   a. Select, screen, train and monitor boxing officials to insure they are competent;
   b. Develop, implement and enforce polices, procedures, rules, and regulations intended to maximize boxer safety;
   c. Refrain from appointing boxing officials who are not qualified;
   d. Require and/or conduct certain medical evaluations, including, but not limited to, obtaining MRI, electroencephalogram (EEG), and computerized tomographic (CT) scans prior to the scheduled bout.
   e. Require and/or conduct pre-bout physical exam within 3 hours of the fight.
   f. Require and/or conduct a neurological examination by a board-certified neurologist or board-certified neurosurgeon prior to Hamzah Al-Jahmi participating in his first boxing contest.
   g. Provide orally and in print form detailed and accurate information on chronic and acute brain injuries that occur in boxing so a boxer may assess the risks to which they are exposed.
   h. Develop and distribute educational information specific to trainers, athletes, parents, referees, and ringside physicians on concussion or brain injury diagnosis and management.
   i. Recognize and communicate the potential for severe acute and long-term consequences of concussive impacts.
   j. Train on concussion and brain injury polices and procedure[s] that outline injury definition, signs and symptoms, and policy on concussion management.
   k. Obtain informed consent to fight and be voluntarily exposed to the full scope of chronic and acute injuries that occur in boxing.
   l. Obtain baseline evaluation of Hamzah Al-Jahmi for purposes of concussion and brain injury management.
   m. Prohibit boxing bouts involving athletes under the age of 25 as their brains are not yet fully developed and more susceptible to brain injury.
   n. Require revision of the boxing scoring system to emphasize skillful offensive and defensive maneuvering and to deemphasize blows to the head and the knockout.
   o. Rescind the rule that there is "no" three knockdown rule, and adopt a rule designed to maximize boxer safety.

{¶ 35} The OAC filed a motion for summary judgment on March 23, 2018 on the basis that Hamzah primarily assumed the risk of any injury, including death, during the boxing match and Hamzah executed a full release with regard to the claims asserted in the complaint. Appellant filed a response to the OAC's motion for summary judgment on April 27, 2018.

{¶ 36} On September 4, 2018, the Court of Claims granted in part, and denied in part, the OAC's motion for summary judgment. The court granted partial summary judgment to the OAC pursuant to express and primary assumption of the risk. The court

---

p.   Rescind the rule that there is "no" standing eight count, and adopt a rule designed to maximize boxer safety.
q.   Rescind the rule that only the referee was permitted to stop a bout.
r.   Use larger gloves with greater padding, weighing between 16-18 oz., or gloves weighing 10 oz or greater.
s.   Have advanced life-support systems available at ringside.
t.   Adopt a concussion protocol or otherwise ensure that the boxer has not sustained a concussion.
u.   Have, maintain, or enforce a formal concussion policy.
v.   Develop and enforce standard criteria for referees, ringside officials, and ringside physicians to halt boxing bouts when a boxer has experienced concussive or sub concussive blows to the head.
w.   Implement measures designed to reduce the incident of brain injuries.
x.   Implement and require objective brain injury risk assessment tools to exclude individual at-risk boxers.
y.   Insure that referees, ringside officials, and ringside physicians were specifically trained and experienced in concussion and brain injury evaluation and management.
z.   Terminate the bout after Hamzah Al-Jahmi sustained severe punishment or was in danger of serious physical harm.
aa.  Require and/or perform an evaluation of Hamzah Al-Jahmi for clinical sigs [sic] of neurological impairment or pain reflecting possible brain trauma and to stop the bout accordingly and send Hamzah Al-Jahmi directly to the hospital.
bb.  Detect clinical sigs [sic] of neurological impairment or pain reflecting possible brain trauma and to stop the bout accordingly and transport Hamzah Al-Jahmi directly to the hospital.
cc.  Implement a rapid assessment concussion evaluation tool, motor-control evaluation and symptom assessment to support a physical and neurologic clinical evaluation.
dd.  Make a concussion diagnosis.
ee.  Appropriately evaluate and treat Hamzah Al-Jahmi during an acute stage of concussion or brain injury by requiring avoidance of any further blows to the head or physical or mental exertion that exacerbates symptoms and injury.
ff.  Prevent a "return to participate" following a concussion or other brain injury.
gg.  Recognize the potential for second-impact syndrome.
hh.  Protect Hamzah Al-Jahmi from Second Impact Syndrome.
ii.  Have a comprehensive evacuation plan for the safe and effective removal of any seriously injured boxer to hospital facilities.
jj.  Ensure the most rapid transportation to a neurological unit by way of an emergency exit plan and ambulance on scene.
kk.  Ensure the ability to perform ringside resuscitation, including endotracheal tube insertion.
ll.  Act as an ordinary and reasonably prudent state agency or person under similar circumstances.
mm.       Avoid additional acts of negligence identified through the discovery process.

(Am. Compl. at ¶ 62.)

found primary assumption of the risk applied such that the OAC did not owe any duty to appellant and, further, that express assumption of the risk applied as the waiver and release reflect the intent of the parties and that the OAC's negligence claims are barred by the agreement. However, the court further found there remained genuine issues of material fact with regard to whether the OAC acted recklessly.

{¶ 37} Specifically, the September 4, 2018 decision addressed appellant's claims that the OAC was negligent and/or reckless by failing to protect Hamzah by modifying its rules for the boxing match,[8] failing to implement concussion protocols or implement measures to reduce the incidence of brain injuries, and failing to take actions to stop the bout earlier. The court granted the OAC's motion for summary judgment finding primary assumption of the risk applied because the risk of head injury could not be eliminated from boxing and, further, that express assumption of the risk applied barring appellant's claim of negligence due to the release and waiver signed by the parties. The court then recognized that appellant had also alleged recklessness, willful, wanton misconduct in his amended complaint and in order to adjudicate the claims as to recklessness, the court would need to analyze whether the OAC or its agents took actions or failed to take action in such a way that enhanced the risk. Because the OAC had not provided any evidence with regard to appellant's recklessness claim, the court could not determine whether the OAC or its employees acted recklessly with regard to Hamzah's boxing match.

---

[8] *See also* Am. Compl. at ¶ 62 b, d-i, k-x, cc, ii-kk where appellant alleges that the OAC should modify its rules for boxing matches *in general* and implement concussion protocols and measures to reduce the incidence of brain injuries *in general*. Whereas the amended complaint at ¶ 62 z, aa, bb, dd, ee, ff, gg, hh, ll allege failures *specific* to Hamzah's boxing match. The Court of Claims construed appellant's motion for summary judgment as "narrow[ing] the basis of his claims" to: (1) Osorio and Dr. Armile were unqualified and the OAC acted recklessly in appointing them and in failing to disclose they were unqualified, and (2) the OAC, through the actions of Osorio and Dr. Armile, acted recklessly in failing to stop the fight in the first round. (May 13, 2020 Decision at 9.) Accordingly, the Court of Claims did not address claims in the amended complaint at ¶ 62 b, d-i, k-x, cc, ii-kk. Appellant does not dispute that it narrowed its claims. In the introduction of appellant's amended motion for summary judgment, appellant summarized his motion for an order of summary judgment in his favor "on the basis that [the OAC] engaged in reckless behavior by (1) appointing dangerously unqualified fight officials, (2) failing to disclose that its fight officials were dangerously unqualified, and (3) failing to stop the bout in round 1." (Pltf.'s Am. Mot. for Summ. Jgmt. at 1.) Furthermore, in his brief before this court, appellant states: "[Appellant] is not asserting that [the OAC] should have done more than the law requires." (Appellant's Brief at 24.) With this statement, appellant appears to acknowledge he is not pursuing the claims alleged in the amended complaint at ¶ 62 b, d-i, k-x, cc, ii-kk as those claims in particular allege the OAC should have done more than the current law requires. Furthermore, the OAC's motions for summary judgment did not address the claims in the amended complaint at ¶ 62 b, d-i, k-x, cc, ii-kk.

{¶ 38} The OAC filed a second motion for summary judgment on October 11, 2019 based on the discretionary immunity doctrine and appellant's inability to meet the burden of proof for a showing of recklessness on the part of the OAC. Attached to the OAC's second motion for summary judgment were exhibits, which include video of the four rounds of the bout in which Hamzah fought.

{¶ 39} On October 25, 2019, appellant filed a response to the OAC's second motion for summary judgment. Included as exhibits to the motion were affidavits by experts Dr. Michael Schwartz, M.D., Dr. James P. Kelly, MA, MD, FAAN, FANA, and Dr. Mayumi Prins, Ph.D.

{¶ 40} Dr. Schwartz' affidavit reflects he is board certified in internal medicine, the founder and former President and Chairman of the American Association of Professional Ringside Physicians, and he serves as the Co-Chairman of the Medical Advisory Board for the ABC. Dr. Schwartz reviewed the video of the bout, specifically round one, and notes Hamzah is not visible after the first knockdown; however, after the second and third knockdowns Hamzah is not steady on his feet, often an indication to stop the bout or at the minimum perform an assessment requiring the boxer to take steps to the left or the right and failure to do so increased the risk of injury or death beyond those inherent in boxing. Dr. Schwartz further notes it was imperative for the ringside physician to go to Hamzah's corner after the first round to determine if the boxer can or should continue to fight, and here the ringside physician did not. Dr. Schwartz opined that if the ringside physician had assessed Hamzah's injury, it is likely signs and symptoms of injury would have been observed. Therefore, failure to do so increased the risk of injury or death beyond those inherent in boxing.

{¶ 41} According to the affidavit of Dr. Kelly, during the relevant time period at issue, he was the Executive Director of the Marcus Institute for Brain Health and Professor, Department of Neurology, University of Colorado School of Medicine. Dr. Kelly described in his affidavit the brain injury suffered by Hamzah as " 'second impact syndrome' * * * known to occur in boxing and other sports. This devastating condition occurs in athletes who are exposed to additional blows to the head while still symptomatic from an earlier concussion." Dr. Kelly further stated the pathology is the same as "shaken baby syndrome." (Oct. 14, 2019 Pltf.'s Response to Deft.'s Second Mot. Summ. Jgmt., Ex. 4, Dr. Kelly Aff.,

attachment 2 at 2.) Dr. Kelly opined, "it is more likely than not that Hamzah [] would have survived the bout on 12/19/2015 if he had been properly evaluated for concussion during the first round, removed from competition and monitored for signs of neurological deterioration. He was put at risk of further injury by allowing him to sustain additional blows to his head, leading to catastrophic brain swelling and death." (Dr. Kelly Aff., attachment 2 at 4.) Dr. Kelly believes it is reasonable to assume those responsible for boxer safety would be aware of the signs and symptoms of concussions.

{¶ 42} Dr. Prins, a Professor at UCLA in the Department of Neurosurgery, and research scientist who specializes in translational research regarding concussions and traumatic brain injury, noted the video of the bout does not capture Hamzah after the first knockdown, but does depict Hamzah as being unsteady after the second and third knockdowns. Dr. Prins also provided the following:

> It was apparent from the video evidence that [Hamzah] was hit repeatedly on the right side of the head during the first round, which is more likely than not when the brain bleeding started. Had a 5 min break been taken and/or [Hamzah] assessed carefully it is probable that evidence of brain injury would have been apparent, that a referee or ringside physician with appropriate knowledge or training in detecting signs of brain injury would have observed that [Hamzah] was injured and thus would have stopped the fight, and he could have been transported to the hospital earlier for intervention and more likely than not would still be alive today.

(Oct. 25, 2019 Pltf.'s Response to Deft.'s Second Mot. for Summ. Jgmt., Ex. 5, Dr. Prins Report at 5.)

{¶ 43} On October 14, 2019, appellant filed a motion for summary judgment claiming the OAC engaged in reckless behavior by: (1) appointing dangerously unqualified fight officials, (2) failing to disclose that fight officials were dangerously unqualified, and (3) failing to stop the bout in round one, ultimately asserting this reckless behavior led to Hamzah's death.[9]

{¶ 44} On October 21, 2019, appellant filed a motion for reconsideration requesting the Court of Claims reconsider its September 4, 2018 ruling granting partial summary

---

[9] Appellant filed an amended motion for summary judgment on October 14, 2019 in order to comply with the court's order limiting the motion not to exceed 20 pages.

judgment to the OAC on the grounds of assumption of the risk. Appellant argued the court's ruling was based on facts known at the time the decision was rendered. In support, appellant contends information received during depositions revealed "extremely troubling information" was withheld from Hamzah and his trainer, Hamood, at the time Hamzah consented to participate in the bout. (Pltf.'s Mot. for Recon. at 1.) The OAC filed a memo contra on October 23, 2019 asserting appellant relies on out of district cases that are unpersuasive because the cases are not primary assumption of the risk cases.

{¶ 45} The Court of Claims rendered a decision on May 13, 2020 in favor of the OAC and denying appellant's motion for reconsideration.

{¶ 46} The court denied appellant's motion for reconsideration finding boxing an inherently dangerous sport to which primary assumption of the risk applies. The court explained, "primary assumption of the risk does not depend on the injured person's subjective consent or appreciation. Rather, the activity at issue is examined to determine if it is inherently dangerous such that risks cannot be eliminated." (May 13, 2020 Decision at 2.) The court further found the OAC's "decisions regarding the qualifications and appointment of ringside physicians and referees are clearly legislative acts and/or the kind of basic policy decisions that discretionary immunity[10] protects." (May 13, 2020 Decision at 14.) Therefore, the court held, the doctrine of discretionary immunity applies to the appointment of Dr. Armile and in the licensing, training, and appointment of Osorio.

{¶ 47} However, the court also found "discretionary immunity does not apply to [appellant's claims]" that Osorio and Dr. Armile were reckless in their failure to stop the bout. (May 13, 2020 Decision at 17.) In its analysis, the court found the duty owed to Hamzah was low, citing boxing as a combat sport for which is reflected in the applicable Ohio rules and also the inherent dangerousness of the sport. On review of the evidence presented by the parties, including video evidence of all four rounds of the bout, the court found no genuine issue of material fact and that the OAC did not act recklessly in failing to stop the bout. In support of its failure to find recklessness, the court pointed to repeated

---

[10] We note that although the OAC asserted "[p]ublic [d]uty [d]octrine" as an affirmative defense in its answer, the OAC did not assert public duty immunity as a ground for granting summary judgment in its favor in either of its motions for summary judgment. (Answer at ¶ 78.) As the OAC did not raise public duty immunity as grounds for judgment in its favor and the Court of Claims did not address public duty immunity, we decline to address the same.

blows to the head and serious head injury as being intrinsic to boxing in addition to the level of experience held by both Hamzah and Hamood. The court found there was no evidence that anyone, including Osorio and Dr. Armile, was aware Hamzah suffered a brain injury or other injury that would necessitate the bout to be stopped. (*See* May 13, 2020 Decision at 17.)

{¶ 48} The Court of Claims entered a judgment entry and rendered in favor of the OAC. This judgment entry made final and appealable the Court of Claims' (1) September 4, 2018 decision entry granting in part, and denying in part, the OAC's motion for summary judgment, and (2) May 13, 2020 decision denying appellant's motion for reconsideration and motion for summary judgment and granting the OAC's motion for summary judgment. Appellant appeals both decisions with his notice of appeal filed June 11, 2020.

## II.  Assignments of Error

{¶ 49} Appellant appeals and assigns the following three assignments of error for our review:

> [I.] THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED, IN PART, DEFENDANT-APPELLEE'S FIRST MOTION FOR SUMMARY JUDGMENT BY (A) APPLYING THE PRIMARY ASSUMPTION OF RISK DOCTRINE, (B) APPLYING THE EXPRESS ASSUMPTION OF RISK DOCTRINE, AND (C) FAILING TO CORRECT ITS ERROR BY DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION.
>
> [II.] THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT.
>
> [III.] THE TRIAL COURT COMMITTED ERROR WHEN IT DENIED PLAINTIFF-APPELLANT'S MOTION FOR SUMMARY JUDGMENT.

## III.  Analysis

{¶ 50} The assignments of error in this case require us to consider the legal doctrines of express and primary assumption of the risk, discretionary immunity, and recklessness. We begin, however, with a general discussion of the standard of review on motions for summary judgment.

## IV.  Standard of Review on Motions for Summary Judgment

{¶ 51} An appellate court reviews a grant of summary judgment under a de novo standard. *Capella III, L.L.C. v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotations and citations omitted.) *Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).  In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the non-moving party.  *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6, citing *Pilz v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-240, 2004-Ohio-4040, ¶ 8.

{¶ 52} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the moving party fails to satisfy its initial burden, the court must deny the motion for summary judgment; however, if the moving party satisfies its initial burden, summary judgment is appropriate unless the non-moving party responds, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial.  *Id.*; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 12, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991).

## V.  First Assignment of Error – Assumption of Risk

{¶ 53} Appellant's first assignment of error asserts the Court of Claims erred by granting the OAC's first motion for summary judgment, and denying appellant's motion for reconsideration. The court granted the OAC's first motion for summary judgment and later denied appellant's motion for reconsideration as it found both express and primary

assumption of risk barred appellant's negligence claims pertaining to the December 19, 2015 bout.

{¶ 54} To establish actionable negligence, one must show the existence of a duty, a breach of that duty, and injury resulting proximately therefrom. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). The existence of a duty is a question of law for the court to determine. *Id*. A defendant's duty to a plaintiff depends on the relationship between the parties and the foreseeability of injury to someone in plaintiff's position. *Morgan v. Ohio Conference of the United Church of Christ*, 10th Dist. No. 11AP-405, 2012-Ohio-453, ¶ 11, citing *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645 (1992). "Ohio law recognizes three categories of assumption of the risk as defenses to a negligence claim: express, primary, and implied or secondary." *Schnetz v. Ohio Dept. of Rehab. & Corr.*, 195 Ohio App.3d 207, 2011-Ohio-3927, ¶ 21 (10th Dist.), citing *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, ¶ 10 (10th Dist.).

## A. Express Assumption of Risk

{¶ 55} Express assumption of risk arises when "a person expressly contracts with another not to sue for any future injuries which may be caused by that person's negligence." *Anderson v. Ceccardi*, 6 Ohio St.3d 110, 114 (1983). Thus, "[e]xpress assumption of the risk applies when parties expressly agree to release liability." *Crace* at ¶ 11. *See also Zigler v. AVCO Corp.*, 165 Ohio App.3d 319, 2005-Ohio-6130, ¶ 18 (6th Dist.), quoting Keeton, Prosser and Keeton and Torts, 496 (5 Ed.1984) (stating that express assumption of risk involves " 'an affirmatively demonstrated, and presumably bargained upon, choice by the plaintiff to relieve the defendant of his legal duty toward the plaintiff' "); *Holmes v. Health & Tennis Corp. of Am.*, 103 Ohio App.3d 364, 367 (1st Dist.1995), citing *Anderson*, 6 Ohio St.3d at 114. While a participant and proprietor of an activity are "free to contract in such a manner so as to relieve the proprietor of responsibility to the participant for the proprietor's negligence," they may not contract to relieve "the proprietor's willful or wanton misconduct." *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 90 (1992). *Accord Denlinger v. Columbus*, 10th Dist. No. 00AP-315 (Dec. 7, 2000), citing *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147 (1978), paragraph two of the syllabus.

{¶ 56} To be enforceable, a "release must be expressed in terms that are clear and unequivocal." *Jacob v. Grant Life Choices Fitness Ctr.*, 10th Dist. No. 95APE12-1633

(June 4, 1996), citing *Thompson v. Otterbein College*, 10th Dist. No. 95APE08-1009 (Feb. 6, 1996). The intent of the parties "is presumed to reside in the language the parties chose to employ in the agreement, and the intention of the parties governs the interpretation of releases." *Id.* To assess whether the terms of a release are clear and unequivocal we ask " 'whether it is clear from the general terms of the entire contract, considered in light of what an ordinary prudent and knowledgeable party of the same class would understand, that the proprietor is to be relieved from liability for its own negligence.' " *Geczi v. Lifetime Fitness*, 10th Dist. No. 11AP-950, 2012-Ohio-2948, ¶ 19, quoting *Hague v. Summit Acres Skilled Nursing & Rehab.*, 7th Dist. No. 09 NO 364, 2010-Ohio-6404, ¶ 22.

{¶ 57} Hamzah executed the bout contract on December 1, 2015, and the promoter of the event, John Loew, executed the contract on December 14, 2015. The bout contract provided that Loew would pay Hamzah $500 to participate in the December 19, 2015 boxing contest. *See* Ohio Adm.Code 3773-4-05(A) (providing that there "must be a contestant/promoter contract signed by both parties for all" boxing matches and that the "state of Ohio contract form must be the valid contract form completed by all parties").

{¶ 58} The heading of the bout contract states that it is a "STATE OF OHIO OHIO ATHLETIC COMMISSION OFFICIAL BOUT CONTRACT." (OAC's Mar. 23, 2018 Mot. for Summ. Jgmt., Profato Aff., Ex. A ("bout contract").) The bout contract further provides as follows:

> Assumption of RISK: The Contestant understands that by participating in a contest or exhibition involving the sport of Boxing or Mixed Martial Arts, that the Contestant is engaging in an abnormally dangerous activity. The Contestant further understands that this participation subjects the Contestant to a risk of severe injury or death. The Contestant, with full knowledge of risk, nonetheless, agrees to enter into this agreement and hereby waives any claim that the Contestant or the Contestant's heirs may have against the Ohio Athletic Commission and/or the State of Ohio as a result of any injury the Contestant may suffer as a result of the Contestant's participation in any contest or exhibition regulated by the State of Ohio.
>
> Release: The parties, for themselves, their heirs, executors, administrators, successors and assigns, hereby release and forever discharge the State of Ohio and the Ohio Athletic

Commission, and each of their members, agents, and employees in their individual, personal and representative capacities from any and all actions, causes of action, suits, debts, judgments, executions, claims and demands whatsoever known or unknown, in law or equity, that the parties ever had, now have, or claim to have against any and all of the persons or entities named in this paragraph arising out of, or by reason of this agreement, or any other matter.

{¶ 59} The Court of Claims found the language of the bout contract clear and unambiguous, and concluded that the "waiver and release reflect[ed] the intent of the parties and that [appellant's] negligence claims are barred by the agreement." (Sept. 4, 2018 Decision at 5.) Appellant contends the court erred because the "OAC was not a party to the contract," and the assumption of risk provision "was limited to the conduct of Hamzah's opponent, Anthony Taylor." (Appellant's Brief at 12-13.) Appellant asserts that the bout contract "did not include the assumption of risk that the OAC, the referee, or the ringside physician would violate any duties owed to Hamzah." (Appellant's Brief at 13.)

{¶ 60} Although Loew and Hamzah executed the agreement, the agreement was the OAC's official bout contract. Through the contract, Hamzah expressly agreed to "waive[] any claim" he may have against "the Ohio Athletic Commission and/or the State of Ohio" resulting from injuries sustained during the December 19, 2015 bout, and to "release and forever discharge the State of Ohio and the Ohio Athletic Commission, and each of their members, agents, and employees" from any claim or cause of action Hamzah or his executor may have as a result of the bout. Thus, as the contract expressly identified the OAC and the OAC's agents as the parties being released, appellant cannot claim that the release pertained to anyone but the OAC. *See Jacob* (stating that, as the release "include[d] the words 'release' and 'negligence' " and "specifie[d] those persons released from liability by stating that 'the Center, its owners, officers, employees, agents, assigns and successors' [were] 'expressly forever released and discharged,' " the plaintiff could not claim he "was unaware that he would be precluded from suing [the defendants] for any alleged negligence on their part"). *Compare Hague* at ¶ 28 (concluding, where a release did not contain the words " 'release' or 'negligence,' and [did] not identify the individuals, company or corporation being released from liability," the release was "too ambiguous and general").

{¶ 61} As the agreement released the OAC from "any and all actions, causes of actions, [or] suits" arising out of, or by reason of, the agreement and was an OAC required contract, on the facts of this case, the language of the bout contract was sufficient to release the OAC from liability for negligence occurring at the bout. *See Schwartzentruber v. Wee-K Corp.*, 117 Ohio App.3d 420, 425-26 (4th Dist.1997) (observing that, while the "better practice would certainly be to expressly state the word 'negligence' somewhere in the exculpatory provision," the court could not "construe a release 'from any and all claims' that arise 'out of any and all personal injur[y]' as anything but a release of liability for negligence"); *Bishop v. Nelson Ledges Quarry Park, Ltd.*, 11th Dist. No. 2004-P-0008, 2005-Ohio-2656, ¶ 23 (concluding that, although the release did not include the term "negligence," as the contract relieved the proprietor from "all liability for any loss, including * * * any loss arising from * * * drowning," it was "sufficient to encompass a loss from drowning due to any alleged negligence on the part of [the proprietor]"). (Emphasis omitted.)

{¶ 62} The plain language of the bout contract informed Hamzah that he was participating in an abnormally dangerous sport which carried the risk of severe injury or death. Pursuant to the waiver and release in the bout contract, an ordinary and prudent person in Hamzah's position would have understood that they were releasing and forever discharging the OAC from liability for negligence resulting from the bout. As such, the court did not err by finding appellant's negligence claims pertaining to the December 19, 2015 bout barred by express assumption of the risk.

## B. Primary Assumption of Risk

{¶ 63} The Court of Claims concluded primary assumption of risk also barred appellant's negligence claims regarding the bout, as the "sport of boxing consists of punches to the head and upper body" and the "risk of a head injury cannot be eliminated from the activity." (Sept. 4, 2018 Decision at 3.) Whether to apply the affirmative defense of primary assumption of the risk presents an issue of law for the court to determine. *Crace* at ¶ 12, citing *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 435 (1996). We therefore review the Court of Claims' application of the doctrine de novo. *Id*.

{¶ 64} Under the doctrine of primary assumption of the risk, "a plaintiff who voluntarily engages in a recreational activity or sporting event assumes the inherent risks

of that activity and cannot recover for injuries sustained in engaging in the activity unless the defendant acted recklessly or intentionally in causing the injuries." *Morgan v. Ohio Conference*, 2012-Ohio-453, at ¶ 13, citing *Crace* at ¶ 13, citing *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, ¶ 12 (10th Dist.). *See also Marchetti v. Kalish*, 53 Ohio St.3d 95 (1990), paragraph one of the syllabus. Primary assumption of risk "completely negates a negligence claim because the defendant owes no duty to protect the plaintiff against the inherent risks of the recreational activity in which the plaintiff engages." *Morgan v. Ohio Conference*, 2012-Ohio-453, at ¶ 14, citing *Crace* at ¶ 15. Thus, "a successful primary assumption of risk defense means that the duty element of negligence is not established as a matter of law." *Gallagher* at 435.

{¶ 65} The rationale underlying the primary assumption of risk doctrine is that "certain risks are so inherent in some activities that they cannot be eliminated, and therefore a person participating in such activities tacitly consents to the risks involved." *Morgan v. Kent State Univ.*, 10th Dist. No. 15AP-685, 2016-Ohio-3303, ¶ 12, citing *Crace* at ¶ 13. *Accord Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, ¶ 19; *Avila v. Citrus Community College Dist.*, 38 Cal.4th 148, 166 (2006) (stating that "the boxer who steps into the ring consents to his opponent's jabs; [and] the football player who steps onto the gridiron consents to his opponents hard tackle"). The goal of the primary assumption of risk doctrine is to strike "a balance between encouraging vigorous and free participation in recreational or sports activities, while ensuring the safety of the players." *Marchetti* at 99. *See Knight v. Jewett*, 3 Cal.4th 296, 319 (1992)[11] (observing that imposing legal liability on sports participants for negligent conduct "might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging" in the sport).

{¶ 66} Courts apply primary assumption of risk to "cases involving sporting events and recreational activities, and generally extend the doctrine to relieve liability of owners, operators, and sponsors of recreational activities." *Ochall v. McNamer*, 10th Dist. No. 15AP-772, 2016-Ohio-8493, ¶ 35, citing *Crace* at ¶ 12, 20. "The doctrine applies regardless of whether the activity was engaged in by children or adults, or was organized, unorganized,

---

[11] *Knight* has been described as the "seminal decision explicating and applying primary assumption of risk in the recreational context." *Nalwa v. Cedar Fair, L.P.*, 55 Cal.4th 1148, 1155 (2012).

supervised, or unsupervised" and applies to "spectators and participants alike." *Id*. at ¶ 35, citing *Gentry* at ¶ 8, 10.

{¶ 67} To succeed on a primary assumption of risk defense, it must be shown that: "(1) the danger is ordinary to the game; (2) it is common knowledge that the danger exists; and (3) the injury occurs as a result of the danger during the course of the game." *Santho* at ¶ 12. "[A] danger ordinary to a game is a danger which is customary to the game." *Ochall* at ¶ 42. "When a danger is a foreseeable part of a game, there will be common knowledge that the danger exists." *Id*. Thus, for primary assumption of risks purposes, the ordinary or inherent risks of an activity "are the foreseeable, common, and customary risks of the activity." *Id*. at ¶ 43.

{¶ 68} Appellant contends that, for primary assumption of risk to apply, the OAC had to establish Hamzah's "*actual awareness of danger and full appreciation of the hazard* operating to injure and *thereafter a voluntary decision to proceed in the face of a known hazard*." (Emphasis sic.) (Appellant's Brief at 22-23.) Appellant argues primary assumption of risk is inapplicable in the present case, as Hamzah could not assume the risk that the referee appointed by the OAC would be "an unqualified referee," i.e., a referee lacking sufficient knowledge of brain injuries in boxing. (Appellant's Brief at 24, 13.)

{¶ 69} However, to determine the ordinary or inherent risks of an activity, a court must "focus[] exclusively upon the activity itself." *Schnetz*, 2011-Ohio-3927, at ¶ 28. Thus, "primary assumption of risk requires an examination of the activity itself and not plaintiff's conduct. If the activity is one that is inherently dangerous and from which the risks cannot be eliminated, then a finding of primary assumption of risk is appropriate." *Gehri v. Capital Racing Club, Inc.*, 10th Dist. No. 96APE10-1307 (June 12, 1997). *See Ochall* at ¶ 49 ("[f]ocusing on the activity" of go-karting on a barrier less, backyard track to find that the inherent risks of the activity included "running into other go-karts on the track, or deviating from the track and running into any object present around the track"); *Morgan v. Kent State*, 2016-Ohio-3303, ¶ 25 (observing that, as karate "involve[es] physical contact in the form of punches, kicks, and other techniques," it is an "inherently dangerous activity from which the risk of harm cannot be eliminated").

{¶ 70} Thus, because primary assumption of risk focuses exclusively on the activity to assess the inherent risks of the activity, the injured plaintiff's "subjective consent to and

appreciation for the inherent risks are immaterial to the analysis." *Crace* at ¶ 16. *See Foggin v. Fire Protection Specialists, Inc.*, 10th Dist. No. 12AP-1078, 2013-Ohio-5541, ¶ 10 (stating that the plaintiff's subjective consent to the inherent risks of an activity are immaterial, because "[t]hose entirely ignorant of the risks of the activity, still assume the risk by participating in the activity"); *Ochall* at ¶ 36 (stating that the plaintiff's "personal belief" that a certain area next to the go-kart track "was a safe zone [was] irrelevant to the primary assumption of the risk analysis").

{¶ 71} Similarly, "the actions or omissions of the defendants" are irrelevant to the primary assumption of risk analysis. *Ochall* at ¶ 47. *See Crace* at ¶ 25 (stating that analyzing the defendant's conduct would inappropriately "shift the focus of the [primary assumption of risk] analysis away from the activity and its inherent risks," and "unnecessarily focus upon the extent of the defendant's involvement and the defendant's classification as a participant, non-participant, coach, instructor, official, operator, owner, sponsor, provider, or otherwise" with "no regard for the inherent risks of the activity"). A court properly analyzes a defendant's conduct when assessing whether the defendant "acted recklessly or intentionally." *Crace* at ¶ 27. *Accord Morgan v. Ohio Conference*, 2012-Ohio-453, at ¶ 16-17 (finding the plaintiff's contention that the hike leader "should have chosen a different path for the hikers that evening" was "essentially a claim that [the hike leader's] conduct was reckless"); *Brumage v. Green*, 2d Dist. No. 2014-CA-7, 2014-Ohio-2552, ¶ 16, quoting *West v. Devendra*, 7th Dist. No. 11 BE 35, 2012-Ohio-6092, ¶ 26 (concluding that, because "flipping off an ATV and getting injured is a risk that is inherent in the recreational activity of riding an ATV," the plaintiff's arguments regarding " '[w]hat causes the driver to lose control is better addressed when determining whether the driver acted intentionally, [or] recklessly' "); *Ochall* at ¶ 47 (finding the plaintiffs' contentions regarding the actions the defendants could have taken "to alter the [go-kart] track for the benefit of spectators essentially amount[ed] to claims that the various defendants were reckless").

{¶ 72} Appellant further contends that in *Moss v. Ohio Assoc. of United States of America/Amateur Boxing Fedn., Inc.*, 2d Dist. No. 2266 (Apr. 2, 1987), the court held that primary assumption of risk does not apply to the sport of boxing. *Moss*, however, found that primary assumption of risk did not apply to the facts of the case, because the "facts involve[d] secondary assumption of risk circumstances evidenced by a breach of an existing

duty owed by appellee, as well as a failure by appellant to exercise due care for his own safety." *Moss*. The plaintiff in *Moss* agreed to fill a vacant slot in a boxing match sponsored by the defendant and, when the plaintiff entered the ring, he discovered that his opponent fought in a higher weight class. The plaintiff "knew he was not supposed to box out of his weight class; knew he was fighting 'over his head' and admitted that he was not physically prepared, or in shape for the fight." *Id.* Nevertheless, the plaintiff decided to compete in the bout, and sustained injury. The court found secondary assumption of risk applicable, as reasonable minds could differ regarding whether the plaintiff's negligence, in knowingly competing in a bout with an opponent outside of his weight class, exceeded the negligence of the defendant, by permitting a bout to occur between boxers of unmatched weight categories.

{¶ 73} Unlike *Moss*, implied or secondary assumption of risk is not at issue in the present case. "To prevail on the defense of implied assumption of the risk, a defendant must demonstrate that the injured participant, in fact, 'consented to or acquiesced in an appreciated or known risk.' " *Crace* at ¶ 17, quoting *Gentry* at 144. *See Cappelli v. Youngstown Area Community Action Council*, 7th Dist. No. 05 MA 175, 2006-Ohio-4952, ¶ 16 (explaining that implied assumption of risk "exists when a plaintiff, who fully understands the risk of harm to himself, nevertheless voluntarily chooses to subject himself to it, under circumstances that manifest his willingness to accept the risk"); *Cave v. Burt*, 4th Dist. No. 03CA2730, 2004-Ohio-3442, ¶ 17. Implied assumption of risk has merged with contributory negligence. *Anderson*, 6 Ohio St.3d at 113-14. Thus, "under the implied assumption of the risk defense, a court must engage in a comparative fault analysis." *Crace* at ¶ 17, citing *Gallagher* at 432.

{¶ 74} There is no allegation that Hamzah competed in knowing violation of the OAC's rules, and the OAC has not alleged that Hamzah acted negligently. Rather, Hamzah competed, in accordance with the OAC's applicable rules and regulations, in the sport he had been training to compete in since he was 12 years old. As such, primary, rather than implied, assumption of risk applied to Hamzah's participation in the December 19, 2015 boxing match.

{¶ 75} The sport of boxing involves two opponents who, while wearing gloves, attempt to land as many punches on each other as possible. While hits below the navel or

to the back are not permissible, punches to the head are the primary target of boxing. Ohio Adm.Code 3773-2-02(Q)(1) and (11). Appellant explained that "[b]lows to the head [are] the primary boxing target because such blows to the head reduce the capacity of an opponent to be able to effectively defend himself, or * * * lead to a 'knock-out.' " (Am. Compl. at ¶ 45.) While a boxer may win a bout by points, appellant acknowledged that the "knock-out" is the "ultimate goal of boxing." (Am. Compl. at ¶ 43.)  A knock-out occurs when, "as a result of a legal blow or a series of legal blows," a downed opponent is unable to rise unassisted after a ten count. Ohio Adm.Code 3773-2-02(J)-(K).  Appellant described a "knock-out" as "acute traumatic brain injury in an opponent" which renders the opponent "unconscious or unable to stand, connoting significant neurological injury." (Am. Compl. at ¶ 44.)

{¶ 76} Thus, as the sport of boxing is played by punching one's opponent primarily in the head in order to cause a knock-out, the risks inherent in the sport are extreme.  Any injury which may result from sustaining blows to the head, including serious brain injury and death, are risks inherent in boxing. *See Foronda v. Hawaii Internatl. Boxing Club*, 96 Haw. 51, 66-67 (Ct.App.Haw.2001) (observing that the "atavistic nature of [boxing] indicates that its inherent risks are extreme," as the very "acme of achievement for a boxer is to so batter the opponent as to induce a temporary coma – otherwise known as a knockout").

{¶ 77} Thus, as the foreseeable, common, and customary risks of boxing include being punched in the head and suffering injuries which may result, it is common knowledge that repeated blows to the head occur in boxing, and Hamzah's injury occurred as a result of hits to the head he sustained during a bout, primary assumption of risk barred appellant's negligence claims pertaining to the December 19, 2015 bout.[12]  Accordingly, the OAC could

---

[12] We note that appellant did not precisely frame his claim against Dr. Armile as a medical claim, and did not file the affidavit of merit which would be required to support such a claim. *See* Civ.R. 10(D)(2) (providing that a "complaint that contains a medical claim * * * as defined in R.C. 2305.113, shall be accompanied by one or more affidavits of merit"); R.C. 2305.113(E)(3) (defining a "medical claim" as a claim "asserted in any civil action against a physician * * * that arises out of the medical diagnosis, care, or treatment of any person"). As appellant's negligence claim against Dr. Armile was not a medical claim, the Court of Claims properly applied primary assumption of risk to the claim. *Compare Classen v. Izquierdo*, 137 Misc.2d 489, 493 (Sup.Ct.NY 1987) (concluding that the plaintiff's claims against the ringside physicians for negligently rendering medical care to the decedent/boxer did not "fall within the ambit" of primary assumption of risk, because professional athletes do not assume the "risk of injury from negligent medical care rendered by physicians who have independently contracted to provide medical services to sports participants").

only be liable for its conduct at the December 19, 2015 bout if appellant established the OAC acted recklessly or intentionally.

{¶ 78} As the Court of Claims did not err by finding appellant's negligence claims pertaining to the December 19, 2015 bout barred by express and primary assumption of risk, the court properly granted the OAC's first motion for summary judgment and denied appellant's motion for reconsideration. Appellant's first assignment of error is overruled.

## VI. Second Assignment of Error – Discretionary Immunity & Recklessness

{¶ 79} Appellant's second assignment of error asserts the Court of Claims erred by granting the OAC's second motion for summary judgment. The court granted the OAC's second motion for summary judgment as it found the OAC's licensing and appointment of Osorio and Dr. Armile, as well as the OAC's rules, regulations, and requirements, protected by discretionary immunity, and that the OAC's agents had not acted recklessly by failing to stop the bout after round one.

### A. Discretionary Immunity

{¶ 80} The discretionary immunity doctrine provides that the "state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds v. State Div. of Parole & Community Servs.*, 14 Ohio St.3d 68, 70 (1984). *Accord Rodgers v. Ohio Parole Bd.*, 10th Dist. No. 92AP-709 (Nov. 17, 1992) (stating that it is "well settled that the state cannot be sued for its legislative functions"); *Enghauser Mfg. Co. v. Eriksson Eng., Ltd.*, 6 Ohio St.3d 31, 35 (1983), *superseded by statute on other grounds* (stating that the "essential acts of governmental decision-making" should not "be the subject of judicial second-guessing or harassment by the actual or potential threat of litigation").

{¶ 81} However, "once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." *Reynolds* at paragraph one of the syllabus. Thus, there is a distinction between "the state's making a decision—for which there is no liability—and its performing the activities necessary to implement that decision—for which there may be liability." *Risner v. Ohio*

*Dept. of Transp.*, 145 Ohio St.3d 55, 2015-Ohio-4443, ¶ 13. In *Reynolds*, for instance, the court held that the plaintiff could not "maintain an action against the state for its decision to furlough a prisoner," but could maintain an action against the state for injuries resulting from the state's "failure to confine the prisoner during non-working hours in accordance with R.C. 2967.26(B)." *Id.* at 70. *See also Risner* at ¶ 17, 27, 1 (stating that, while the Ohio Department of Transportation's ("ODOT") decisions to improve a particular portion of an intersection and not improve other portions of the intersection were protected by discretionary immunity, ODOT could be "subject to liability" if it failed to execute those decisions "in accordance with current construction standards").

{¶ 82} In *Foster v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 12AP-503, 2013-Ohio-912, this court considered whether decisions by prison medical personnel to allow an inmate's lower-bunk restriction to lapse and assign the inmate to an upper bunk were protected by discretionary immunity. *Foster* analyzed, and ultimately overruled, a prior decision from this court, which held that discretionary immunity protected "the decision of the prison's medical personnel to allow [the inmate's lower-bunk] restriction to lapse without renewal," because the decision was "characterized by the exercise of a high degree of discretion." *Brown v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 10AP-790, 2011-Ohio-3652, ¶ 11.

{¶ 83} Reviewing the discretionary immunity doctrine as stated in *Reynolds*, we found the analysis in *Brown* "problematic." *Foster* at ¶ 15. We observed that, as "many state employees are called upon to exercise a high degree of discretion while working," if courts were to find "that discretionary immunity applies every time a state employee exercises discretion in performing his or her job, we would be vastly expanding the scope of the discretionary immunity doctrine while simultaneously limiting the scope of the state's waiver of sovereign immunity." *Id.* at ¶ 23. As such, we held that the "application of the discretionary immunity doctrine requires more than a finding that a state employee * * * made a decision that required the exercise of a high degree of discretion—it requires a finding of the exercise of a high degree of official judgment or discretion as to an executive or planning function involving the making of a basic policy decision." *Id.* Thus framed, we found the prison's decision regarding the inmate's upper bunk assignment not entitled to discretionary immunity, as the decision did not involve "the exercise of an executive or

planning function, such as prison security, involving the making of a basic policy decision which [was] characterized by the exercise of a high degree of official judgment or discretion." *Id.* at ¶ 26. *See Miller v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-849, 2014-Ohio-3738, ¶ 35 (concluding that ODOT's decision regarding whether "to fill a pothole" was not subject to discretionary immunity, as the decision did not involve the "complex evaluation" which would demonstrate "the exercise of an executive or planning function involving the making of a basic policy decision characterized by the exercise of a high degree of official judgment or discretion"). *Compare Burse v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 17AP-452, 2019-Ohio-2882, ¶ 17 (stating that ODRC is "entitled to discretionary immunity for decisions on inmate placement under the doctrine set forth in *Reynolds*").

{¶ 84} Considering the discretionary immunity doctrine as stated in *Reynolds* and *Foster*, we find the OAC's decisions regarding developing, implementing, or rescinding rules, regulations, policies, procedures, or protocols, and decisions regarding training requirements or educational materials for referees or ringside physicians, were protected by discretionary immunity. Such decisions required the exercise of a high degree of discretion regarding an executive or planning function of the OAC and involved the making of basic policy decisions by the agency. As such, discretionary immunity barred appellant's claims asserting the OAC acted negligently and/or recklessly by failing to enact or rescind various rules or requirements.

{¶ 85} While the OAC's decision to license Osorio and appoint Dr. Armile involved discretion, the OAC failed to demonstrate that these decisions concerned an executive or planning function involving the making of a basic policy decision.[13] Rather, these decisions

---

[13] The Court of Claims relied on *Lewis v. Ohio Dept. of Health*, 66 Ohio App.3d 761 (10th Dist.1990), *Schweisberger v. Medical Bd. of Ohio*, 10th Dist. 92AP-1766 (Apr. 8, 1993), and *Robinson v. Office of Disciplinary Counsel*, 10th Dist. No. 98AP-1431 (Aug. 26, 1999), to support its conclusion that discretionary immunity applied to the OAC's licensing and appointment of Osorio and Dr. Armile. Notably, these cases all pre-date this court's decision in *Foster*. Moreover, while each case indicated that discretionary immunity could apply to the agency's decision in the case, none of the cases analyzed whether the decision concerned an executive or planning function involving the making of a basic policy decision. Each case also relied, primarily, on the doctrine of public duty immunity (see discussion of public duty immunity in fn. 15 below). *See Lewis* at 763 (concluding that the state could not be liable for its "inspection and licensing procedures" at a nursing home, as these activities concerned a public duty, and further stating, without analysis, that such activities were entitled to discretionary immunity); *Schweisberger* (concluding that the plaintiff could not bring a claim against the state medical board for failing to discipline a podiatrist, as the plaintiff failed to demonstrate that the medical board owed "an individual duty to [her] as opposed to a public duty"); *Robinson* (stating that, even if the Ohio Disciplinary Counsel ("ODC") was not entitled to discretionary immunity for the allegedly negligent acts of its employees, the plaintiffs could not maintain an action against the ODC for its failure to

required the OAC's agents to apply and enforce the relevant statutory and administrative code provisions pertaining to referees and ringside physicians. Pursuant to the doctrine of discretionary immunity as stated in *Reynolds* and *Foster*, the OAC could be liable for the negligent acts of its agents or employees in carrying out the licensing and appointment activities of the agency. *Reynolds* at paragraph one of the syllabus. Accordingly, the Court of Claims erred by finding the OAC's licensing and appointment decisions subject to discretionary immunity.

{¶ 86} Our review of the record demonstrates a genuine issue of material fact regarding whether the OAC acted negligently by licensing Osorio. R.C. 3773.42 provides that, upon filing an application for a referee's license and paying the applicable fee, the OAC "shall issue the license to the applicant" if it determines that the applicant is "not likely to engage in acts detrimental to the fair and honest conduct of public boxing matches," and that the applicant is "qualified to hold such a license by reason of the applicant's knowledge and experience." A person will not be found to possess the "knowledge and experience necessary to qualify that person to hold a referee's license" unless the following conditions are met:

> (A) The person has completed such referee training requirements as the commission prescribes by rule.
>
> (B) The person possess such experience requirements as the commission prescribes by rule.

R.C. 3773.42.

{¶ 87} Osorio stated that he "[p]robably" obtained his referee's license from the OAC in 2014. (Osorio Depo. at 16.) Osorio indicated he obtained his license and had refereed other professional bouts before the December 19, 2015 event.

{¶ 88} Prior to September 29, 2015, R.C. 3773.42 required, in addition to sections (A) and (B), the following condition:

> (C) The person has obtained a passing grade on an examination administered by the commission and designed to test the

---

investigate certain attorneys because the ODC did not owe plaintiffs a duty to "act on their individual behalf"). *See also Elliot v. Ohio Dept. of Ins.*, 88 Ohio App.3d 1, 7 (10th Dist.1993) (noting, in dicta, that the superintendent's decision to grant a license to an insurance agent "may" be subject to discretionary immunity, but failing to analyze whether the licensure decision concerned an executive or planning function involving the making of a basic policy decision).

examinee's knowledge of the rules of the particular sport that the person seeks to referee, the commission's rules applicable to the conduct of matches and exhibitions in the particular sport that the person seeks to referee, and such other aspects of officiating as the commission determines appropriate to its determination as to whether the applicant possesses the qualifications and capabilities to act as a referee.

{¶ 89} Ohio Adm.Code 3773-5-03 provides that a person shall not be found to possess the "knowledge and experience necessary to qualify them to hold a referee's license" unless the following conditions are met:

(1) They are at least twenty-one years of age;

(2) They have experience as an amateur or professional referee; or have been evaluated by the executive director, inspector or person delegated by the commission.

(3) They have a current Ohio license to referee.

Ohio Adm.Code 3773-5-03(A).[14]

{¶ 90} In response to the OAC's second motion for summary judgment, appellant asserted the OAC never administered, and that Osorio never passed, the examination required by former R.C. 3773.42(C). The Court of Claims noted the former R.C. 3773.42(C) examination requirement, but did not address whether Osorio satisfied this requirement, as it found the OAC's licensure decision subject to discretionary immunity. Notably, even if an agency's licensing decision could, in certain scenarios, meet the requirements for discretionary immunity, an agency's failure to comply with a statutory mandate would not be subject to discretionary immunity.

{¶ 91} Osorio affirmed that, to obtain his referee's license from the OAC, he had a "one-on-one" with an experienced referee named "Randy Jarvis" who showed Osorio "how to walk around the ring" with "professionals." (Osorio Depo. at 17, 23.) Osorio indicated that moving around the ring was all he learned during his one-on-one with Jarvis. Osorio stated that after his time with Jarvis he "registered" by "fill[ing] out an application, [and] send[ing] [his] fee." (Osorio Depo. at 22.) Osorio stated that he "could have" had just one session with Jarvis. (Osorio Depo. at 25.)

---

[14] Ohio Adm.Code 3773-5-03(A) contained the same requirements in 2014.

{¶ 92} Profato explained that the process for obtaining a referee's license through the OAC involved shadowing another referee, submitting an application, and paying a fee. (Profato Depo. at 19-20, 23.) Profato stated that a prospective referee would shadow "two" other referees "four or five times," or "at least three," and certainly "[m]ore than one" time. (Profato Depo. at 22, 26-27.) Profato stated that all shadowing sessions occurred at actual bouts. Regarding Osorio, Profato stated that he recalled "they recommended he could referee." (Profato Depo. at 25.)

{¶ 93} Profato further stated that after receiving the recommendation Osorio could referee, the OAC would have "called [Osorio] and says, okay, you've passed your test. If you want to become a referee, fill out your application, and send it in." (Profato Depo. at 25.) However, from Profato's testimony, it is unclear whether the reference to "pass[ing] your test" meant that Osorio had completed his shadowing requirement, or that Osorio took and passed an examination. Profato further stated that, after a number of shadowing sessions, a prospective referee would "work one, maybe two of the bouts, and they're evaluated. That's their final test. And they're evaluated on that. And if they pass that, because they've got that far, then they're issued a license." (Profato Depo. at 27.) Profato explained that he did not have any of the paperwork pertaining to Osorio's license because the OAC shreds all documents after three years. (Profato Depo. at 20-21, 29.)

{¶ 94} Osorio did not indicate whether he took a test of any kind before obtaining his license from the OAC. Rather, Osorio affirmed that his one-on-one with Jarvis, filling out an application, and sending in a fee constituted "everything that [he] did to become a referee to referee professional bouts in Ohio." (Osorio Depo. at 26.) While Profato and Osorio both averred that Osorio satisfied the Ohio Adm.Code 3773-5-03 requirements to referee, neither averred that Osorio took or passed the examination required by former R.C. 3773.42(C).

{¶ 95} The OAC acknowledges that "besides the hands-on training and approval of referees discussed in the depositions/affidavits, there is no other evidence in the record as to what the [former R.C. 3773.42(C)] 'examination' consisted of." (OAC's Brief at 26.) As such, the OAC asserts that it was within the "OAC's discretion how to conduct such an examination." (OAC's Brief at 26.) While we agree that the manner and method of

conducting the examination fell within the OAC's discretion, it was not within the OAC's discretion to fail to comply with an applicable statutory requirement.

{¶ 96} Viewing the evidence in a light most favorable to appellant, the record fails to demonstrate that the OAC administered, or that Osorio passed, the examination required by former R.C. 3773.42(C). Furthermore, appellant presented evidence indicating that a "referee * * * with an appropriate level of knowledge more likely than not would have stopped this bout during round one or before the beginning of round two," and that if the bout had been stopped following round one, it was "more likely than not" that Hamzah would have survived. (Dr. Schwartz' Report at 12; Dr. Kelly's Report at 4.) Accordingly, viewing the evidence in appellant's favor, reasonable minds could find that the OAC acted negligently by licensing Osorio in violation of former R.C. 3773.42(C).[15]

{¶ 97} Appellant, however, fails to present a genuine issue of material fact regarding whether the OAC acted negligently by appointing Dr. Armile to serve as the ringside physician at the December 19, 2015 bout. Ohio Adm.Code 3773-2-04 provides that at least "one physician" must be present "at ringside at all times" during a boxing match. To be a ringside physician, the individual must "be a licensed medical doctor or a doctor of osteopathic medicine, and must be legally authorized to practice medicine in the state." Ohio Adm.Code 3773-2-04(A).

{¶ 98} Dr. Armile satisfied Ohio Adm.Code 3773-2-04(A), as he was a doctor of osteopathic medicine authorized to practice in Ohio. There was no licensure procedure to become a ringside physician; rather, a prospective ringside physician simply had to fill out an application and establish they were a licensed physician. As Dr. Armile satisfied the applicable requirements to be a ringside physician, reasonable minds could only conclude that the OAC did not act negligently by appointing Dr. Armile to serve as a ringside physician.

---

[15] Our resolution of this issue does not consider public duty immunity. The public duty immunity doctrine, now codified in R.C. 2743.02(A)(3)(a), provides that "the state is immune from liability in any civil action or proceeding involving the performance or nonperformance of a public duty." *See also Sawicki v. Ottawa Hills*, 37 Ohio St.3d 222 (1988). Notably, "licensing" is specifically identified as a "public duty" of the state. R.C. 2743.01(E)(1). However, the OAC did not raise public duty immunity in its motions for summary judgment, and the court never addressed public duty immunity. As such, we will not address the issue for the first time on appeal.

**B. Recklessness**

{¶ 99} Appellant contends the OAC acted recklessly by: (1) assigning Osorio to referee the bout, and (2) failing to stop the bout after round one. The Court of Claims did not address whether the OAC acted recklessly by assigning Osorio to referee the bout, as it found the OAC's assignment of officials subject to discretionary immunity. We disagree with that assessment pursuant to our above analysis. Regarding whether Osorio and/or Dr. Armile acted recklessly by failing to stop the bout, the court acknowledged "some variation in the testimony of the witnesses regarding Hamzah's condition during the fight," but concluded that the evidence failed to establish "a genuine issue of material fact and that [the OAC and its agents] did not act recklessly in failing to stop the fight." (May 13, 2020 Decision at 19.)

{¶ 100} "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, at paragraph four of the syllabus, adopting 2 Restatement of the Law 2d, Torts, Section 500 (1965). Thus, an actor's conduct may be considered reckless when the actor " 'does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another,' " but also " 'that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Marchetti* at 96, fn. 2, quoting 2 Restatement of the Law 2d, Torts, Section 500 (1965). While negligence consists of "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergence," reckless misconduct "requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Id.* at 100, fn. 3, quoting Restatement of Torts 2d at 590, Section 500, comment g.

{¶ 101} In *Thompson v. McNeill*, 53 Ohio St.3d 102, 106 (1990), *modified on other grounds* by *Anderson*, 2012-Ohio-5711, the court explained that, with respect to co-participants in an activity, "[w]hat constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the

particular game is played, i.e., the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game." *Thompson* at 105. Thus, if the rules of the sport "allow conduct intended to harm another player, as they do in boxing or football, for example, it follows that those same rules also allow behavior that would otherwise give rise to liability for recklessness." *Id.* Accordingly, as between co-participants in a sport, courts should recognize the "inverse relationship between duty and dangerousness" in assessing reckless conduct, as " 'participants in bodily contact games * * * owe a lesser duty to each other than do * * * others involved in non-physical contact sports.' " *Id.*, quoting *Hanson v. Kynast*, 38 Ohio App.3d 58, 64 (5th Dist.1987). In light of *Thompson*, the court of claims concluded that, "given the inherent dangerousness of boxing, * * * the duty owed to Hamzah was low." (May 13, 2020 Decision at 19.)

{¶ 102} However, unlike *Thompson*, the OAC's agents in the present case were not co-participants in the boxing match with Hamzah. "[T]he scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." *Knight*, 3 Cal.4th at 317. For example, with respect to a spectator injured by a baseball player's carelessly thrown bat, "the duty of the stadium owner to provide a reasonably safe stadium with regard to the relatively common (but particularly dangerous) hazard of a thrown bat," differs from the "duty of the ballplayer to play the game without carelessly throwing his bat." *Id.*, citing *Ratcliff v. San Diego Baseball Club of the Pacific Coast League*, 27 Cal.App.2d 733, 736 (1938). Thus, "in the sports setting, as elsewhere, the nature of the applicable duty * * * varies with the role of the defendant whose conduct is at issue in a given case." *Id.* at 318. Accordingly, to assess whether the OAC or its agents acted recklessly, we must delineate each actor's role in, and relationship to, the boxing match.

{¶ 103} The OAC sanctioned the bout and assigned the officials who worked at the December 19, 2015 bout. As such, the OAC was a sponsor or organizer of the boxing match. While " 'operators, sponsors and instructors in recreational activities posing inherent risks of injury have no duty to eliminate those risks,' " such parties " 'do owe participants the duty not to unreasonably increase the risks of injury beyond those inherent in the activity.' "

*Ochall* at ¶ 78, quoting *Nalwa v. Cedar Fair, L.P.*, 55 Cal.4th 1148, 1162 (2012).[16]  *Accord Bundschu v. Naffah*, 147 Ohio App.3d 105, 113 (7th Dist.2002), quoting *Am. Golf Corp. v. Superior Court of Los Angeles Cty.*, 79 Cal.App.4th 30, 37 (2000) (stating that "a recreation provider has a duty, 'not to increase the risk of harm over and above the inherent risk of the sport' "); *Estate of McNeil v. FreestyleMX.com*, 177 F.Supp.3d 1260, 1272 (S.D.Cal.2016) (stating that the "organizer and promoter of the freestyle motocross event" owed the plaintiff a limited duty of care, "breached only if they increased the risk beyond that which is inherent to the activity itself").  In *Ochall*, we concluded that the organizers of a go-karting event did not act recklessly, as the evidence failed to demonstrate that they "increase[d] the risks inherent in the activity of go-karting." *Id.* at ¶ 79.

{¶ 104}  Profato affirmed he would expect a referee to appreciate that brain injuries occur in boxing. Profato further affirmed that, if a referee were ignorant of the fact a boxer could sustain a brain injury while boxing, that "would enhance the risk of a brain injury in boxing." (Profato Depo. at 39.) However, Profato admitted the OAC did nothing to confirm whether a prospective referee had "a satisfactory awareness of brain injuries and concussive impacts in boxing." (Profato Depo. at 40.)  Thus, Profato affirmed the OAC assumed a prospective referee would have sufficient awareness "that there are brain injuries in boxing," but that the OAC neither affirmed nor disaffirmed that assumption. (Profato Depo. at 41.) Profato indicated he would not have allowed Osorio to referee if he knew that Osorio "lacked an appropriate foundation of brain injuries in boxing." (Profato Depo. at 67.)

{¶ 105}  Osorio was not able to articulate an understanding as to how the brain might receive an injury in boxing, and stated that he did not know if a boxer could receive a brain injury while boxing.  As such, Osorio affirmed that he was not able to articulate the signs and symptoms of a brain injury which may occur while boxing. Osorio affirmed he

---

[16] In *Nalwa*, the plaintiff argued that sponsors of recreational activities should be held to the ordinary duty of due care. The court disagreed, holding as follows:

> A rule imposing negligence duties on sponsors, organizers and operators of recreational activities would encompass not only commercial companies like defendant but also noncommercial organizations without extensive budgets or paid staff. Such groups might not easily afford insurance to cover injuries that are inherent risks of the activity; nor could they readily collect large fees from participants to cover that cost. The primary assumption of risk doctrine helps ensure that the threat of litigation and liability does not cause such recreational activities to be abandoned or fundamentally altered in an effort to eliminate or minimize inherent risks of injury.

*Id.* at 1167.

was generally "aware that concussions happen, but [he did not] know how they happen or to what part of the body." (Osorio Depo. at 70.) Osorio also stated he was not aware boxing was a dangerous sport. Viewing the evidence in a light most favorable to appellant, Osorio was ignorant of the fact that a boxer could sustain a brain injury while boxing.

{¶ 106} As the entity which sanctioned the bout and assigned the officials, the OAC owed Hamzah a duty to not unreasonably increase the risk of injury inherent in boxing. Although boxing carries extreme inherent risks, Profato's testimony demonstrates that by assigning Osorio to referee the bout, the OAC enhanced the risk of injury to the participants in the bout. While the OAC's rules did not require a referee to have training regarding concussions or head injuries, as the executive director of the OAC, Profato testified that a referee lacking such knowledge would enhance the risk of injury to boxers. Accordingly, viewing the evidence in a light most favorable to appellant, a reasonable factfinder could find the OAC acted with a conscious disregard or indifference toward boxer safety by appointing a referee who lacked any knowledge regarding head injuries in boxing to officiate the bout, thereby unreasonably increasing the risk of injury to the contestants. Accordingly, we find a genuine issue of material fact regarding whether the OAC acted recklessly by assigning Osorio to referee the bout.

{¶ 107} As the referee of the bout, Osorio was "the sole arbitrator of [the] bout and [was] the only individual authorized to stop a contest." Ohio Adm.Code 3773-2-02(B). The OAC's rules specify that the referee "shall direct and control the bout." Ohio Adm.Code 3773-5-04(A). When a boxer is knocked down "the referee must immediately order the other boxer to a neutral corner and shall thereafter pick up the count from the timekeeper." Ohio Adm.Code 3773-2-02(K). The referee "may terminate the count and the bout if they decide the safety of the downed opponent is at risk." Ohio Adm.Code 3773-2-02(K). *See* Ohio Adm.Code 3773-2-02(O)(5) (stating that the referee also "may stop the bout" if a boxer has "conducted themselves in an unsportsmanlike manner").

{¶ 108} Osorio affirmed that he had "a duty to the boxer to protect their safety," and stated that his job as the referee was to ensure that the "rules are implemented and that the boxers are safe." (Osorio Depo. at 75, 35.) Osorio affirmed that the "health and safety of a boxer" was the "most important factor" in determining whether a bout should be stopped. (Osorio Depo. at 60.) Dr. Armile affirmed that a boxing referee must have the ability to

"identify and assess concussions in boxers," and that a referee who lacked knowledge regarding concussions or brain injuries in boxing would "fall below the standard of care that the referee would owe the boxer." (Dr. Armile Depo. at 41-43.)

{¶ 109} As the ringside physician, Dr. Armile stated that his duty was "[t]o monitor the fighters" for any "[s]igns of injury." (Dr. Armile Depo. at 28.) Dr. Armile agreed that a ringside physician would have a duty to identify and assess concussions in boxers, and affirmed that, if a ringside physician was concerned a boxer had sustained a concussion, the ringside physician should intervene to assess the boxer. Although the referee is the only individual authorized by the rules to stop a bout, the evidence demonstrated that a referee would comply with a ringside physician's request to stop a bout.

{¶ 110} In *Huston v. Brookpark Skateland Soc. Club, Inc.*, 8th Dist. No. 108222, 2020-Ohio-1493, the plaintiff was injured at defendant's roller rink when another skater, who was skating at a dangerous speed, ran into the plaintiff. A skate guard was on duty at the roller rink, and the evidence demonstrated it was the skate guard's duty to ensure skaters were "skating at a safe speed so that the rink [was] safe for all skaters" and to "blow his or her whistle" and correct a skater who was skating too fast. *Id.* at ¶ 16-17. The court found a genuine issue of material fact regarding whether the roller rink acted recklessly, as the record demonstrated that the "in-line skater who hit [the plaintiff was] skating at a dangerous and excessive speed prior to hitting her" and "that the in-line skater's behavior was observable multiple times by the [skate guard]." *Id.* at ¶ 34. Thus, as the skate guard had the duty and opportunity "to stop and correct the in-line skater," the court concluded that a reasonable jury could find the skate guard's failure to do so reckless. *Id. See also Sicard v. Univ. of Dayton*, 104 Ohio App.3d 27, 30 (2d Dist.1995) (stating that reasonable minds could find the defendant's conduct reckless, where the defendant "agreed to act as a spotter for [the plaintiff]" while the plaintiff was weight-lifting but "turned away to speak to another person," resulting in a weight falling on the plaintiff, as such conduct "created an unreasonable risk of physical harm to [the plaintiff] * * * because of the extremely heavy weight involved and [the plaintiff's] vulnerability to serious injury should [the defendant] fail to perform as a spotter for him").

{¶ 111} Courts from other jurisdictions have observed that a coach or referee may be liable to a participant in a game, if the coach or referee engages in reckless conduct which

is " 'totally outside the range of the ordinary activity' * * * involved with coaching or officiating the sport." *Karas v. Strevell*, 227 Ill.2d 440, 465 (2008), quoting *Knight*, 3 Cal.4th at 320. *Accord Kahn v. E. Side Union High School Dist.*, 31 Cal.4th 990, 1011 (2003), quoting *Knight* at 318 (stating that a coach or sports instructor may be liable for conduct involved in coaching or instructing if it is "alleged and proved that the instructor acted * * * recklessly in the sense that the instructor's conduct was 'totally outside the range of the ordinary activity' * * * involved in teaching or coaching the sport"). In *Kahn*, the court found a triable issue of fact regarding whether a swim coach acted recklessly, as the evidence demonstrated that the "coach directed [the] plaintiff (a novice on the swim team) to perform a shallow racing dive in competition without providing any instruction, that he ignored her overwhelming fears [about performing the dive] and made a last-minute demand that she dive during competition," in breach of a promise the coach previously made to the plaintiff "that she would not be required to dive." *Kahn* at 1013.

{¶ 112} Considering the foregoing authorities and the evidence regarding the role of the referee and ringside physician at a boxing match, we find a professional boxing referee has a duty to: (1) assess a boxer for concussion when the boxer is exhibiting signs of concussion observable to a reasonable professional boxing referee; (2) determine if the boxer is in a condition to continue the bout; and (3) stop the bout if a reasonable professional boxing referee would determine the boxer was not in a condition to continue the bout. We also find a ringside physician has a duty to: (1) assess a boxer for concussion when a boxer is exhibiting signs of concussion observable to a reasonable ringside physician; (2) determine if the boxer is in a condition to continue the bout; and (3) intervene to direct the referee to stop the bout if a reasonable ringside physician would determine the boxer was not in a condition to continue the bout. The referee primarily, with the ringside physician advising, controls whether the bout will continue or stop. *See Wattenbarger v. Cincinnati Reds, Inc.*, 28 Cal.App.4th 746, 754 (1994) (explaining that when a defendant is not a "coparticipant[] in the sport or activity but * * * instead [is] in control of it," deciding "what would be done and when," the defendant owes the plaintiff/participant a duty "not to increase the risks inherent in the game"). Accordingly, we consider whether Osorio and/or Dr. Armile failed to comply with their aforementioned duties, and, if so, whether they knew or had reason to know of facts demonstrating that

failing to comply with their duties unreasonably increased risks, beyond those inherent in the activity, of physical harm to the participants in the bout.

{¶ 113} One of the primary disputes in the present case is whether Hamzah, following the three knockdowns in the first round, was exhibiting observable signs of a possible concussion or brain injury.[17] Dr. Ugokwe and Dr. Kenneth Ransom indicated that, among other symptoms, signs of a concussion could include being unable to walk straight,[18] having wobbly legs or knees, being woozy or dizzy, or being unable to focus. (Dr. Ugokwe Depo. at 14; Dr. Ransom Depo. at 14-15.) Osorio, Profato, and Dr. Armile testified that Hamzah did not exhibit any of these signs following the knockdowns in round one. (Defendant's Second Mot. for Summ. Jgmt., Profato Aff. at ¶ 8-9; Osorio Aff. at ¶ 5-6; Dr. Armile Aff. at ¶ 7-8; Osorio Depo. at 97; Dr. Armile Depo. at 25.) The OAC therefore contends that, because Osorio, Profato, and Dr. Armile testified they did not see these signs of a head injury during the first round, the OAC could not have acted recklessly by failing to stop the bout after round one.

{¶ 114} However, other evidence in the record indicated that witnesses observed Hamzah unsteady on his feet or wobbly following the knockdowns in round one. Medic Schiavone noted, as round one was occurring Hamzah "SUSTAINED A MASSIVE AMOUNT OF HITS TO THE HEAD," "WAS KNOCKED TO THE GROUND MULTIPLE TIMES," and was "UNSTEADY AFTER COMING TO HIS FEET." (Schiavone Depo., Ex. A at 3.) Schiavone explained that following the hits to the head in round one, Hamzah appeared as though he could not "figure out how to stand up." (Schiavone Depo. at 93, 126.) Medic Horton also testified that Hamzah appeared "very uneasy on his feet, unsteady on his feet" following the knockdowns in round one. (Horton Depo. at 19.) Hamzah's father stated that during the "first round" Hamzah's "legs started wiggling" after Hamzah was "hit in his head." (Al-Jahmi Depo. at 38.) Hamzah's friend Yacoubi stated that Hamzah "had

---

[17] Although the OAC notes that Hamzah went on to win the second and third rounds, our analysis of whether Osorio or Dr. Armile acted recklessly is confined to whether they should have stopped the bout during or immediately after the first round. As such, Hamzah's conduct following the first round is not relevant to our analysis.

[18] Although Profato stated that the OAC had put out a "standard * * * for the referees that * * * when a fighter is knocked down that when then get up, the referee will step to the left or right when that boxer walks out * * * if they have any kind of tendency to stagger out, the fight is immediately stopped," this standard went into place in "2016 or 2017." (Profato Depo. at 86.)

spaghetti legs for a second," meaning that Hamzah was "kind of wobbling," following the second knockdown in round one. (Yacoubi Depo. at 19.)

{¶ 115} Drs. Kelly, Schwartz, and Prins all stated they had watched the video of the December 19, 2015 bout and believed the video depicted Hamzah as being unsteady on his feet following the knockdowns in round one. (Oct. 25, 2019 Pltf.'s Response to Deft.'s Second Mot. for Summ. Jgmt., Ex. 4, Dr. Kelly Aff. attachment 1 at 2; Ex. 2, Dr. Schwartz Aff. attachment 1 at 2; Ex. 5, Dr. Prins Aff. attachment 1 at 2.) Despite the poor quality of the video, when viewed in a light most favorable to appellant, the video could support the witnesses' statements indicating that Hamzah was wobbly or unsteady on his feet following the knockdowns in round one.

{¶ 116} Appellant supported his response to the OAC's second motion for summary judgment with a report from Richard Steele, a professional boxing referee with 34 years of experience. Steele concluded that there were "enough grounds to stop this bout in the first round," as Hamzah "was given two standing 8-counts in the first round" and received "heavy blows to his head." (Steele Report at 4.) Steele opined that a properly trained and supervised referee would have been able to "identif[y] the injuries in round one and would have stopped the bout." (Steele Report at 6.) Dr. Schwartz stated the fight "should have been stopped once Hamzah was unsteady on his feet following a knockdown," and that "by failing to do so the risk of injury or death to Hamzah was increased beyond those risks that are inherent in boxing." (Dr. Schwartz' Report at 2-3.) Dr. Schwartz explained that, after Hamzah was unsteady on his feet following the knockdowns in round one, it was "imperative that the referee" escort Hamzah to his corner and "determine if he [was] in condition to continue the fight." (Dr. Schwartz' Report at 3.) Osorio affirmed that, if Hamzah had been unsteady on his feet following the knockdowns in round one, Osorio would have either stopped the bout or called the ringside physician. (Osorio Depo. at 99.)

{¶ 117} Dr. Prins opined that "[a]n appropriate assessment of [Hamzah] by either the referee or ringside physician more likely than not would have revealed that [Hamzah] suffered concussive impacts or other traumatic brain injury in round one, and once revealed the fight would not have continued beyond round one." (Dr. Prins' Report at 4.) Dr. Schwartz opined that a "referee and ringside physician with an appropriate level of

knowledge more likely than not would have stopped this bout during round one or before the beginning of round two." (Dr. Schwartz' Report at 12.)

{¶ 118} Accordingly, we find a genuine issue of material fact regarding whether Osorio acted recklessly, in particular: (1) whether Hamzah was exhibiting signs of concussion observable to a reasonable professional boxing referee thereby triggering Osorio's duties to assess Hamzah for concussion and determine whether he was in a condition to continue the bout; (2) whether a reasonable professional boxing referee would determine Hamzah was not in a condition to continue the bout and thus would stop the bout; and (3) whether, in failing to stop the bout, Osorio unreasonably increased the risks, beyond those inherent in the activity, of injury to Hamzah. Viewing the evidence in a light most favorable to appellant, Hamzah was exhibiting observable signs of a concussive impact following the knockdowns in round one. Appellant presented evidence indicating it was totally outside the range of ordinary conduct for a professional boxing referee to fail to assess a boxer and determine whether he was in a condition to continue the bout when a boxer was observed to be wobbly following a knockdown and to fail to stop the bout when it is determined the boxer was not in a condition to continue the bout. Accordingly, reasonable minds could find Osorio's failure to assess Hamzah and determine whether he was in a condition to continue the bout and to stop the bout when he had the duty and opportunity to do so, while he knew or should have known that Hamzah was exhibiting signs of a concussion or brain injury, unreasonably increased the risks, beyond those inherent in the activity, that Hamzah would sustain injury.

{¶ 119} Similarly, we find a genuine issue of material fact regarding whether Dr. Armile acted recklessly, in particular: (1) whether Hamzah was exhibiting signs of concussion observable to a reasonable ringside physician thereby triggering Dr. Armile's duties to assess Hamzah for concussion and determine whether he was in a condition to continue the bout; (2) whether a reasonable ringside physician would determine Hamzah was not in a condition to continue the bout and thus would intervene to direct the referee to stop the bout; and (3) whether, in failing to assess Hamzah, determine if he was in a condition to continue the bout and intervene and direct Osorio to stop the bout, Dr. Armile unreasonably increased the risks, beyond those inherent in the activity, of injury. After Hamzah appeared unsteady on his feet in round one, Schiavone affirmed she informed Dr.

Armile that she was "concerned about Hamzah and [she] thought that [Dr. Armile] should assess him." (Schiavone Depo. at 133.) Schiavone stated that she "asked the doctor if he could check [Hamzah's] eyes," but indicated that Dr. Armile did not check Hamzah's eyes. (Schiavone Depo. at 136.) Dr. Armile denied having any conversation with ringside medics prior to the fourth round, and stated the ringside medics did not recommend that he intervene to assess Hamzah before the start of round two. (Dr. Armile Depo. at 66-67.)

{¶ 120} Dr. Schwartz, an experienced ringside physician, stated that after Hamzah was noticeably unsteady on his feet in round one, "it was imperative for the ringside physician to go to the fighter's corner * * * to assess the fighter." (Dr. Schwartz' Report at 3.) Dr. Schwartz opined that, if the ringside physician had assessed Hamzah after round one, "it is likely that a properly trained doctor would have observed signs and symptoms of an injury and would have stopped the bout." (Dr. Schwartz' Report at 3.) Notably, Dr. Armile affirmed that if Hamzah "was wobbly after either of those knockdowns" in round one, he "would have intervened and done further assessment." (Dr. Armile Depo. at 66.)

{¶ 121} Viewing the evidence in a light most favorable to appellant, witnesses observed Hamzah to be wobbly or unsteady on his feet following the knockdowns in round one and the ringside medics told Dr. Armile to assess Hamzah at the time. Appellant presented evidence indicating it was totally outside the range of ordinary conduct for a ringside physician to fail to assess a boxer when a boxer was observed to be wobbly or unsteady on his feet following a knockdown. Accordingly, reasonable minds could find Dr. Armile had a duty to assess Hamzah and determine whether he was in a condition to continue the bout as well as to intervene and direct Osorio to stop the bout after round one, and that Dr. Armile's failure to do so, when he knew or should have known Hamzah was exhibiting signs of a concussion or head injury, unreasonably increased the risks, beyond those inherent in the activity, of injury to Hamzah.

{¶ 122} Accordingly, we hold the Court of Claims did not err by finding appellant's claims pertaining to the OAC's rules, policies, and procedures barred by discretionary immunity, but that the court did err by finding the OAC's licensure and appointment decisions protected by discretionary immunity. We find genuine issues of material fact regarding whether the OAC acted negligently by licensing Osorio, whether the OAC acted recklessly by appointing Osorio to referee the bout, whether Osorio acted recklessly by

failing in the duties to assess Hamzah, determine if he was in a condition to continue the bout and ultimately to stop the bout following the knockdowns in round one, and whether Dr. Armile acted recklessly in failing to assess Hamzah, determine if he was in a condition to continue the bout and intervene to direct Osorio to stop the bout following the knockdowns in round one. Appellant's second assignment of error is sustained in part and overruled in part.

## VII. Third Assignment of Error – Appellant's Motion for Summary Judgment

{¶ 123} Appellant's third assignment of error asserts the Court of Claims erred by denying his motion for summary judgment. Appellant's motion for summary judgment asserted that reasonable minds could only find the OAC acted recklessly by appointing unqualified fight officials, failing to disclose the qualifications of the fight officials, and by failing to stop the bout in round one. Pursuant to our above analysis, we have found genuine issues of material fact regarding whether the OAC engaged in reckless conduct. We do not, however, find that reasonable minds could only find the OAC engaged in reckless conduct. Rather, the question of whether the OAC or its agents acted recklessly involves questions of fact to be resolved by the trier of fact, not by summary judgment. *See State ex rel. Anderson v. Obetz*, 10th Dist. No. 06AP-1030, 2008-Ohio-4064, ¶ 64, quoting *Lakota Local School Dist. Bd. of Edn. v. Brickne*r, 108 Ohio App.3d 637, 643 (6th Dist.1996) (stating that " '[t]he purpose of summary judgment is not to try issues of fact, but is, rather, to determine whether triable issues of fact exist' "). Appellant's third assignment of error is overruled.

## VIII. Conclusion

{¶ 124} Having overruled appellant's first and third assignments of error, but having sustained in part and overruled in part appellant's second assignment of error, we affirm the September 4, 2018 decision of the Court of Claims of Ohio and affirm in part and reverse in part the May 13, 2020 decision of the Court of Claims. This case is hereby remanded to that court for further proceedings consistent with law and this decision.

*Judgment affirmed in part,*
*reversed in part; cause remanded.*

SADLER and BEATTY BLUNT, JJ., concur.

SADLER, J., concurring in part and concurring in judgment.

{¶ 125} I believe primary and express assumption of risk applies in this case to bar all of appellant's negligence claims, and, therefore, unlike the majority I would refrain from discussing OAC's purported negligence concerning licensing of the referee. Moreover, while I agree with the majority that appellant succeeded in demonstrating a genuine issue of material fact exists regarding whether OAC or its agents acted recklessly, I write to emphasize this conclusion is based on the unique and often conflicting evidence in this case and the specific arguments presented by the parties on summary judgment. Because I agree with the outcome set forth in the majority decision but differ in my reasoning in some respects, I concur in part and concur in judgment.

{¶ 126} The sport of boxing entails punching an opponent, in the head or upper body, with such repetition and/or force that the opponent is either knocked unconscious or endures to win or lose the bout on points. As acknowledged by the majority, the inherent risks of boxing include serious brain injury and death, and these risks cannot be eliminated. Moreover, Hamzah signed a contract that expressly informed him he was participating in an abnormally dangerous activity which carried the risk of severe injury or death, and, with this knowledge, Hamzah signed a broadly worded waiver and release of claims against OAC.

{¶ 127} Based on this information, the majority correctly decides in the first assignment of error that appellant's negligence claims pertaining to the bout are barred by primary and express assumption of risk. However, the majority also evidently concludes that primary and express assumption of risk do not encompass appellant's negligence claim based on licensing Osorio or Dr. Armile, which the majority proceeds to discuss in the second assignment of error. I disagree.

{¶ 128} In my view, primary assumption of risk applies in this case to bar all of appellant's negligence claims since Hamzah sustained his injury as a result of being punched repeatedly on the head during the bout—a risk directly associated with boxing. As previously established, this risk is inherent to the sport of boxing and cannot be eliminated. In other words, even the most experienced and properly licensed referee and onsite medical crew cannot prevent boxing from being inherently dangerous. By concluding OAC's licensing decisions fall outside primary assumption of risk, the majority focuses on the actions of the defendant rather than the nature of the activity itself. *Ochall* at ¶ 52 ("The

trial court erred in its primary assumption of the risk analysis because it failed to ascertain the risks inherent in the activity of go-karting. Instead, the trial court wrongly focused on the defendants, and the duty they owed to appellants, rather than focusing on the activity at issue."); *Morgan v. Kent State Univ.*, 10th Dist. No. 15AP-685, 2016-Ohio-3303, ¶ 19, quoting *Crace* at ¶ 25 (" 'the analysis of the doctrine focuses exclusively on the activity itself. * * * A holding to the contrary would likely shift the focus of the analysis away from the activity and its inherent risks. The analysis would then unnecessarily focus upon the extent of the defendant's involvement * * *. Injured participants would frame their allegations sufficiently to cast a liability net just beyond the reach of *Marchetti* [*v. Kalish*, 53 Ohio St.3d 95 (1990)] and *Thompson* [*v. McNeill*, 53 Ohio St.3d 102, 104 (1990)], with no regard for the inherent risks of the activity' ").

{¶ 129} Moreover, regarding express assumption of risk, the contract expressly informed Hamzah that he was participating in an abnormally dangerous activity which carried the risk of severe injury or death, and, with this knowledge, Hamzah waived "any claim * * * against the [OAC] * * * as a result of any injury [he] may suffer as a result of [his] participation" and released OAC "from any and all actions * * * whatsoever known or unknown * * * arising out of, or by reason of this agreement, or any other matter." (Official Bout Contract at 1.) Based on the contract language in this case, I would find express assumption of risk barred appellant's negligence claims.

{¶ 130} Therefore, unlike the majority decision, and in line with the Court of Claims' September 4, 2018 decision we are affirming, I would find that primary and express assumption of risk disposes of appellant's negligence claims and would instead address appellant's licensing concerns under a recklessness standard, i.e. whether OAC's actions unreasonably increased the risk of injury to Hamzah beyond those inherent in the activity. In doing so, I note, as does the majority, that OAC did not raise public duty immunity at this stage and did not show its licensing decision as to Osorio was protected under the discretionary immunity doctrine.

{¶ 131} Considering the specific evidence presented here, and viewing that evidence in a light most favorable to appellant, I agree with the majority's assessment that a reasonable fact finder could find OAC unreasonably increased the risk of injury to Hamzah: (1) by licensing and appointing a referee who lacked any knowledge regarding

head injuries, particularly considering OAC's own testimony that doing so would enhance the risk of a brain injury; (2) through its (undisputed) agent, Osorio, for Osorio's failure to assess Hamzah and determine whether he was in a condition to continue the fight; and (3) through its (undisputed) agent, Dr. Armile, for Dr. Armile's failure to assess Hamzah and determine whether he was in a condition to continue the fight.

{¶ 132} Therefore, I would find a genuine issue of material fact exists to prevent summary judgment in favor of OAC on these claims of recklessness. In doing so, I would emphasize our decision—particularly the discussion of the duty owed by referees and ringside physicians—is based on the evidence presented by the parties in this one case at the summary judgment stage. In my view, we should not use the evidence of this case to establish safety policies and procedures for the sport of boxing in Ohio.

{¶ 133} Considering the above, I join the majority in affirming the Court of Claims' September 4, 2018 decision and entry, and affirming in part and reversing in part the court's May 13, 2020 judgment. Because I would do so under different reasoning, I respectfully concur in part and concur in judgment.

———————————